BANK OF JACKSON COUNTY,
Plaintiff–Appellant,

v.

L. James CHERRY; Raymond
G. Naeyaert, Defendants–
Appellees.

No. 91–3547.

United States Court of Appeals,
Eleventh Circuit.

Jan. 11, 1993.

Stone & Sutton, Pamela Dru Sutton, Michel L. Stone, Jerry W. Gerde, Panama City, Fla., for plaintiff-appellant.

Benjamin Beard, Pensacola, Fla., Barbara L. Herwig, Michael S. Raab, U.S. Dept. of Justice–Appellate Staff, Civ. Div., Washington, D.C., for defendants-appellees.

Before HATCHETT and DUBINA, Circuit Judges, and GODBOLD, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In this appeal, we affirm the district court's ruling that Farmers Home Administration (FmHA) officials did not deprive a bank of First Amendment, liberty, or property rights when they debarred the bank.

### FACTS

The Bank of Jackson County (BJC) is a small bank in northwest Florida. In September, 1981, BJC loaned money to Elmer and Shirley Ferris to purchase forty-six dairy cows. The Farmers Home Administration, a federal agency, guaranteed the loan. In 1982, when the Ferrises began surreptitiously removing their cattle from Florida, BJC took possession of the cows remaining at the Ferrises' farm. BJC and FmHA sold the cows jointly and put the proceeds into a joint account.

In September, 1984, BJC informed FmHA that it had begun applying funds from the joint account to its debts. FmHA objected, and a dispute followed. In July, 1986, FmHA informed BJC that it would not negotiate further over ownership of the funds until BJC restored the amounts that it had withdrawn from the account.

For nearly two years, FmHA did not communicate again with BJC regarding the Ferris cow dispute. Then, on April 14, 1988, Raymond G. Naeyaert, Florida chief of FmHA farmer programs, instructed the FmHA supervisor in Holmes County not to issue a conditional commitment for an FmHA guarantee on a BJC loan to a local farmer named Adron Miller. Naeyaert told the supervisor that he was not to conduct any further business with BJC because of the unresolved dispute over the Ferris proceeds.

The same day, an Assistant United States Attorney for the Northern District of Florida, Benjamin Beard, wrote a letter to the General Counsel's Office of the U.S. Department of Agriculture in Atlanta. In relevant part, Beard stated:

> [A]s I understand the facts of this case, [BJC] officials *intentionally and with knowledge misrepresented their actions* in the case and thereafter flatly refused to comply with their represented agreement. At the very least that is *civil fraud* and in my view demonstrates that *the bank officials do not believe that they are required to deal in a forthright and ethical manner with the government.*
>
> If that is their belief, then I believe it is exceedingly unwise to enter into any financial transaction with them wherein the FmHA would have to rely on these officials to conduct servigin [sic] and to deal honestly with the FmHA.... [Emphasis added.]

On May 5, 1988, Ted Elders, an Agriculture Department attorney, wrote to L. James Cherry, Florida state director of the FmHA, agreeing with Beard's opinion. Elders suggested that Cherry consider withdrawing from pending transactions involving BJC and refuse to undertake any new transactions with the bank.

On June 1, 1988, Cherry wrote to BJC stating that (1) FmHA would not "enter into any loan guaranty submitted by [BJC]"; (2) FmHA would honor existing guaranties; and (3) FmHA was terminating its Treasury Limited Account with BJC on July 1, 1988. The reason for these actions, according to Cherry, was BJC's refusal to negotiate in "good faith" over the Ferris cow dispute. Cherry and Naeyaert, the appellees, admitted that the purpose of the letter was to discontinue all further dealings with BJC in Florida, except those relating to existing guaranties. FmHA's Alabama office, however, continued to issue guaranties on new BJC loans.

In July, 1988, Glen Walden, the acting Florida director of the FmHA, wrote to BJC rejecting its latest settlement offer in the dispute over the Ferris proceeds. Walden reaffirmed FmHA's earlier settlement offer and encouraged BJC to accept it. In doing so, Walden stated:

I am confident that when you consider the alternatives you will agree to a settlement more in line with what we are able to accept so we may discontinue the proposed litigation and resume normal relations between the bank and FmHA.

BJC did not accept FmHA's settlement offer, and on September 9, 1988, FmHA sued BJC over the Ferris proceeds.

FmHA's Florida office continued to refuse to issue new guaranties on BJC loans. In February, 1989, Naeyaert wrote the Jackson County FmHA supervisor, rejecting his request for a guaranty on a BJC loan to Charles M. Patrick, a local farmer. Naeyaert stated that FmHA would not issue new guaranties on BJC loans because of the bank's failure to negotiate in "good faith" in the Ferris cow dispute. Around this same time, Cherry approved two BJC loan renewals, but reiterated that his office would not issue any new guaranties.

Appellees also continued to use the guaranty program as a lever to force resolution of the Ferris dispute. On May 5, 1989, Cherry met with Thomas W. Wilder, BJC's president, at a "fish fry" for Agriculture Secretary Clayton Yeutter in Marianna, Florida. Wilder stated his belief that FmHA had "debarred" BJC without following the proper procedural requirements for that penalty. Cherry responded that the Florida FmHA office would resume its business relationship with BJC as soon as the Ferris cow litigation was settled.

In April, 1990, the District Court for the Northern District of Florida entered judgment in the Ferris cow litigation, finding BJC entitled to $25,000 and FmHA entitled to $62,000. Although the dispute was thereby resolved, FmHA did not resume its business relationship with BJC.

## PROCEDURAL HISTORY

BJC brought this *Bivens* action against Cherry and Naeyaert alleging that termination of the business relationship with FmHA ("debarment") deprived BJC of its constitutional rights. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In particular, the complaint alleged that termination of the business relationship, without following procedural requirements contained in FmHA regulations, deprived BJC of liberty and property without due process of law. The complaint further alleged that the debarment penalized BJC for exercising its First Amendment right to petition the government for a redress of grievances in the Ferris cow dispute. BJC sought damages against appellees in their individual capacities and injunctive relief in their official capacities.

The district court entered summary judgment for appellees on the damages claims and for BJC on the injunctive claim. The court found that FmHA failed to follow its own debarment regulations, and ordered BJC reinstated "as a viable participant in the Florida FmHA programs." The court found, however, that the debarment did not deprive BJC of a liberty or property interest. In the alternative, the court held that appellees were immune from suit under the qualified immunity doctrine, because any deprivation did not violate BJC's clearly established constitutional rights. Similarly, the court held that appellees' actions did not violate BJC's clearly established First Amendment rights.

BJC appealed from the district court's entry of summary judgment for appellees on the damages claims. Appellees do not cross-appeal from the injunction ordering BJC reinstated in FmHA lending programs.

## CONTENTIONS OF THE PARTIES

BJC contends that appellees deprived it of clearly established liberty and property interests without due process of law when they debarred it without following FmHA's debarment procedures. BJC also contends that the debarment violated its clearly established First Amendment right to petition the government for redress of grievances. Appellees respond that the debarment did not deprive BJC of liberty or property. To the extent that the debarment did work such a deprivation, however, BJC's rights were not clearly established. Thus, appellees are immune from suit under the quali-

fied immunity doctrine. Appellees also contend that the debarment did not violate any of BJC's clearly established First Amendment rights.

### ISSUES

The issues presented are:

(1) Whether the debarment deprived BJC of clearly established liberty or property rights without due process of law; (2) whether the debarment violated BJC's clearly established First Amendment rights.

### DISCUSSION

#### A. Due Process Claim

The government may not deprive any person of "life, liberty or property without due process of law." U.S. Const. amend. V. BJC argues that it had a property interest in FmHA's loan guaranty program. Moreover, BJC argues that appellees deprived it of liberty when they debarred it from that program on the basis of "stigmatizing" allegations. Because appellees deprived BJC of these constitutionally protected interests without affording it the process due under the Fifth Amendment, BJC argues it is entitled to damages.

To prevail upon its procedural due process claim, BJC must establish: (1) a constitutionally protected interest in life, liberty or property; (2) governmental deprivation of that interest; and (3) the constitutional inadequacy of procedures accompanying the deprivation. *See Lehr v. Robertson*, 463 U.S. 248, 256, 103 S.Ct. 2985, 2990, 77 L.Ed.2d 614 (1983); *Greenholtz v. Inmates of the Nebraska Penal and Correction Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979); *Board of Regents v. Roth*, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972). Failure to establish any one of these elements is fatal to BJC's due process claim.

#### 1. Property Interest

██ A property interest must rest upon "a legitimate claim of entitlement." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. Courts have consistently held that "no citizen has

a 'right' ... to do business with the government." *Gonzalez v. Freeman*, 334 F.2d 570, 574 (D.C.Cir.1964); *see also Sutton v. U.S. Dept. of Housing and Urban Development*, 885 F.2d 471, 474 (8th Cir.1989) (individual had no constitutionally protected property interest in membership on panel of government approved property appraisers); *ATL, Inc. v. United States*, 736 F.2d 677, 683 (Fed.Cir.1984) (suspended contractor has no property interest in government contracts); *Transco Security, Inc. v. Freeman*, 639 F.2d 318, 321 (6th Cir.1981) (right to bid on government contracts is not a property interest). BJC points to no "independent source" of law securing to it the right to participate in FmHA's loan guaranty program. *See Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. While BJC surely attaches great importance to FmHA loan guaranties, our analysis must focus not upon the weight of BJC's interest, but upon the "nature" of that interest. *Roth*, 408 U.S. at 570–71, 92 S.Ct. at 2705–06. Simply put, federal law does not create an entitlement to FmHA loan guaranties. Thus, the "nature" of BJC's interest in such guaranties is "an abstract need or desire" to obtain them. *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. Because BJC is not entitled to FmHA loan guaranties, it has no property interest in them.

BJC relies heavily upon *Gonzalez v. Freeman* to support the property right it asserts in this case. But *Freeman* held no more than that debarment works a sufficient economic injury on the plaintiff to confer standing. 334 F.2d at 574–75. It did not hold that the plaintiffs in that case had a property interest in doing business with the government. Indeed, the court explicitly recognized that contractors have no such right. 334 F.2d at 574. The holding in *Freeman* that debarment works a sufficient economic injury to confer standing is insufficient to overcome the weight of more recent cases, holding uniformly that suspended or debarred contractors have no property interest in doing business with the government. *See Sutton*, 885 F.2d at 474; *ATL*, 736 F.2d at 683; *Transco*, 639 F.2d at 321.

## 2. Liberty Interest

■ Liberty interests are both broader and more difficult to define than property interests. While property exists in concrete entitlements secured by independent sources of law, liberty interests cannot be so easily characterized. As the Supreme Court stated nearly seventy years ago:

[Liberty] denotes not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized as essential to the orderly pursuit of happiness by free men.

*Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). "In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." *Roth*, 408 U.S. at 572, 92 S.Ct. at 2707. This broad conception of liberty encompasses a person's interest in his or her reputation, coupled with the more tangible benefits or entitlements which rest upon a person's good name. *See Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976).

The Supreme Court defined this liberty interest in reputation in a series of cases decided in the 1970s. In *Roth*, the Court held that a state university's refusal to renew the contract of a nontenured professor did not deprive the professor of a liberty interest, because the state made no charges against the professor "that might seriously damage his standing and associations in his community." 408 U.S. at 573, 92 S.Ct. at 2707. The state did not impose upon the plaintiff "a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Roth*, 408 U.S. at 573, 92 S.Ct. at 2707. In *Paul*, the Court addressed the reverse situation. There, the Court held that the state's widespread defamation of the plaintiff did not deprive him of liberty, because the damage to reputation was not accompanied by any tangible loss. 424

U.S. at 701, 96 S.Ct. at 1160. Finally, in *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), the Court held that termination of a police officer for alleged misconduct did not infringe upon the officer's liberty, because the city did not publicly disclose the allegations of misconduct. 426 U.S. at 348, 96 S.Ct. at 2079.

Thus, to prevail on a claim that government action deprived the plaintiff of a liberty interest in reputation, the plaintiff must show: (1) a stigmatizing allegation, *Roth*, 408 U.S. at 573, 92 S.Ct. at 2707; (2) dissemination or publication of that allegation, *Bishop*, 426 U.S. at 348, 96 S.Ct. at 2079; *Roth*, 408 U.S. at 573–74, 92 S.Ct. at 2707; and (3) loss of some tangible interest due to publication of the stigmatizing allegation. *Paul*, 424 U.S. at 701, 96 S.Ct. at 1160; *Roth*, 408 U.S. at 573–74, 92 S.Ct. at 2707. *See also Larry v. Lawler*, 605 F.2d 954, 957 (7th Cir.1978) (summarizing the Supreme Court's liberty interest doctrine).

Federal circuit courts of appeal have applied this line of cases to hold that suspension or debarment of a government contractor on the basis of stigmatizing allegations deprives the contractor of liberty under the due process clause. *See ATL, Inc. v. United States*, 736 F.2d 677, 683 (Fed. Cir.1984); *Transco Security, Inc. v. Freeman*, 639 F.2d 318, 321 (6th Cir.1981); *Old Dominion Dairy v. Secretary of Defense*, 631 F.2d 953, 966 (D.C.Cir.1980). BJC argues that its debarment from the Florida FmHA loan guaranty program constituted the "tangible loss" required by *Paul*, and that FmHA's accusations of bad faith constituted the stigmatizing allegations required by *Roth*.

Although the question is a close one, we hold that appellees' actions in this case did not deprive BJC of any constitutionally protected liberty interest. Assuming for purposes of this discussion that FmHA's accusation of bad faith constituted a stigmatizing allegation, that allegation was neither sufficiently publicized, nor sufficiently injurious, to deprive BJC of liberty under the Due Process Clause.

A stigmatizing allegation does not implicate liberty interests unless it is publicized.

*See Bishop,* 426 U.S. at 348, 96 S.Ct. at 2079; *Roth,* 408 U.S. at 573–74, 92 S.Ct. at 2707; *Sutton,* 885 F.2d at 475. In the instant case, FmHA communicated its accusations of BJC's bad faith only to BJC itself and to two FmHA county supervisors in Florida. In addition, appellees communicated the facts of the Ferris cow dispute to an assistant U.S. attorney for the Northern District of Florida and to Department of Agriculture lawyers. As in *Bishop* and *Sutton,* where the courts found no deprivation of liberty, appellees did not disclose any negative information about BJC to the public. And, although appellees discussed BJC's case with government lawyers, they did not communicate the allegations of BJC's misconduct to any other government agency.

BJC argues that the scope of publication was sufficiently broad to impose a tangible injury. BJC's president stated in an affidavit that he "felt obliged" to disclose to potential qualified borrowers that BJC was ineligible for FmHA loan guaranties. In addition, communication of the bad faith charges to FmHA's county supervisors ensured that BJC would receive no new loan guaranties in Florida. According to BJC, the allegation of bad faith, coupled with the tangible loss of the opportunity to participate in FmHA's Florida loan program, was sufficient to deprive it of liberty under the Due Process Clause.

We disagree. All of the cases upon which BJC relies involved a much broader injury to the contractor than BJC suffered in this case. In *Old Dominion,* the court found that the contractor relied upon the Department of Defense for nearly "100 percent" of its business; that suspension "effectively put Old Dominion out of business"; and that "the government action in this case effectively foreclosed Old Dominion's freedom to take advantage of other government employment opportunities and barred [it] from all public employment." 631 F.2d at 956, 963–64. In *Transco,* the defendant official suspended Transco from bidding on all General Services Administration contracts. 639 F.2d at 320. Finally, in *ATL, Inc.,* the court found that ATL's "work is done almost entirely with the federal government," and that the Navy's suspension prevented it "from further contracting with any federal government agency." 736 F.2d at 679–80.

The injury to BJC pales in comparison to the injuries found in the above-cited cases. BJC's president testified that "twenty to twenty-five percent" of BJC's outstanding loans were "made for agricultural purposes." Even if all of those loans involved FmHA guaranties, a fact not borne out by the record, BJC would not be as dependent upon the foreclosed government program as were the plaintiff contractors in *ATL, Transco,* and *Old Dominion.* Appellees' debarment of BJC from Florida FmHA loan programs had only a limited impact on BJC. FmHA continued to guaranty BJC's loan renewals in Florida, and it continued to guaranty all of BJC's loans in Alabama. BJC introduced no evidence that appellees' actions affected its dealings with any other government agency besides the Florida FmHA office.

The affidavit of BJC's president stating that he "felt obliged" to disclose BJC's debarment does not compensate for the deficiencies in BJC's case. The bare statement of the affidavit does not tell us how many potential customers the bank lost because of these disclosures. In addition, the government imposed no duty upon BJC to disclose the *reason* for its debarment. Without disclosure of the stigmatizing allegation, the mere loss of BJC's government benefit did not infringe upon its liberty interests. *Bishop,* 426 U.S. at 348, 96 S.Ct. at 2079; *Roth,* 408 U.S. at 573–74, 92 S.Ct. at 2707.

These distinctions from prior cases amount to an important difference. Simply put, appellees' actions in this case did not deprive BJC of its constitutionally protected liberty. BJC remained free to obtain FmHA guaranties for loan renewals in Florida, and for all loans in Alabama. It remained free to do business with any of the numerous federal agencies that deal with banks. And finally, BJC remained fully free to conduct the seventy-five to eighty percent of its business that was unrelated to agriculture.

The loss of one particular kind of government loan guaranty in a limited geographical area, constituting a limited portion of BJC's business, did not impose so severe a constraint on the bank's freedom that it may be called a deprivation of liberty. *See Roth,* 408 U.S. at 573–74, 92 S.Ct. at 2707; *Sutton,* 885 F.2d at 475. If BJC were as dependent upon new FmHA loan guaranties in Florida as the suspended and debarred plaintiffs were on government contracts in *ATL, Transco,* and *Old Dominion,* this case might have a different outcome. On these facts, however, we cannot conclude that appellees' actions deprived BJC of liberty.

■ Although we hold that BJC is not entitled to damages under the Due Process Clause, our opinion does not undermine the district court's determination that BJC was entitled to injunctive relief. Appellees do not cross-appeal that decision. Cherry and Naeyaert debarred BJC from an FmHA program without following FmHA's own procedures for such a penalty. As the district court found, neither statutory law nor the Due Process Clause entitled BJC to a damages remedy. Nonetheless, the message to FmHA officials must be clear: They may not grant or deny the opportunity to participate in FmHA programs without following the agency's regulations. Conditioning important benefits upon a person's compliance with the arbitrary demands of government officials presents precisely the kind of potential power abuse that the debarment procedures are intended to prevent.

B. First Amendment Claim

■ BJC argues that the debarment infringed upon its First Amendment right to petition the government for redress of grievances. According to BJC, appellees debarred it in retaliation for vigorously defending its rights in the Ferris cow dispute. BJC relies upon cases holding that retaliatory prosecution against individuals who pursue claims against the government infringes upon their First Amendment rights. *See, e.g., Haynesworth v. Miller,* 820 F.2d 1245 (D.C.Cir.1987).

The record plainly reveals that appellees used the opportunity to participate in the Florida loan guaranty program as a lever to coerce favorable settlement of the Ferris cow dispute. While such a tactic may be the norm between private parties, it has no place in government. FmHA's debarment regulations provide procedural protection against such tactics. If FmHA's claim that BJC acted dishonestly had merit, then appellees could have used the debarment procedure to reach the intended result. Alternatively, if FmHA's claims lacked merit, then the procedure would have helped protect BJC from an erroneous debarment. These arguments provide additional justification for the district court's decision, reached on other grounds, to order BJC reinstated in the Florida loan guaranty program.

■ Whether BJC may recover damages against Cherry and Naeyaert, however, presents a distinct question. The doctrine of qualified immunity protects government officials from civil liability for any action which "does not violate clearly established or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). A right is clearly established only if the unlawfulness of the conduct that allegedly violates the right would have been apparent to an objective, reasonable official "in light of clearly established law and the information possessed by the official at the time the conduct occurred." *Nicholson v. Georgia Dept. of Human Resources,* 918 F.2d 145, 147 (11th Cir.1990) (citing *Anderson v. Creighton,* 483 U.S. 635, 641–42, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987)). Because the purpose of qualified immunity is to "keep the public official out of the courtroom, free to exercise discretionary duties under clearly established law without the constant threat of lawsuits," its determination on summary judgment is strongly favored. *Ansley v. Heinrich,* 925 F.2d 1339, 1347 (11th Cir.1991). *See also Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985); *Harlow v.*

*Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738.

The First Amendment right to petition the government for a redress of grievances includes a right of access to the courts. *See, e.g., NAACP v. Button,* 371 U.S. 415, 429-30, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 (1963); *Haynesworth,* 820 F.2d at 1255. The law is clearly established that the government burdens this right when it prosecutes an individual solely because that person refuses to release civil claims against the government. *See, e.g., Haynesworth,* 820 F.2d at 1255-57. *Cf. Wilson v. Thompson,* 593 F.2d 1375, 1386 (5th Cir. 1979) (federal court may enjoin state criminal prosecution where it finds that purpose "to retaliate for or to deter" constitutionally protected conduct motivated prosecution). According to BJC, these retaliatory prosecution cases should have put appellees on notice that their debarment of BJC in order to coerce favorable settlement of the Ferris cow dispute infringed upon BJC's First Amendment right of access to the courts.

BJC offers no precedent upon which this court could base a holding that the government's use of debarment to coerce the favorable settlement of a civil dispute unconstitutionally infringes upon a civil litigant's First Amendment rights. We do not reach that question, however, because we may hold appellees liable in this case only if the First Amendment right BJC asserts was clearly established at the time appellees engaged in the challenged conduct. *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039; *Nicholson,* 918 F.2d at 147. We hold that BJC's First Amendment right was not clearly established. The retaliatory prosecution cases upon which BJC relies are simply too far afield from the facts of the present case to put reasonable, objective officials on notice that BJC's debarment might infringe its First Amendment rights.

As the name implies, retaliatory prosecution involves criminal prosecution. Criminal prosecution triggers an array of consti-

tutional, historical, and statutory considerations inapplicable to the specific situation presented here. Neither BJC nor its officers faced the loss of freedom or lasting stigma associated with criminal prosecution. Any legal similarity between BJC's debarment, on the one hand, and criminal prosecution, on the other, would not have been readily apparent to government officials attempting to do their jobs on a day-to-day basis. In the absence of such an apparent similarity, viewed through the eyes of reasonable, objective government officials, BJC cannot overcome appellees' qualified immunity defense. *See Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039; *People of Three Mile Island v. Nuclear Regulatory Comm'n,* 747 F.2d 139, 144 (3d Cir.1984).

We believe that one additional factor supports the district court's finding of qualified immunity in this case. In *Haynesworth,* the court noted that prosecutors appeared not to have any legitimate law enforcement objective in seeking release of the plaintiff's civil claims against the government. 820 F.2d at 1256-57. In the present case, however, where BJC was the defendant in a civil lawsuit that the government brought to recover its interest in the proceeds of a foreclosure sale, pursuit of settlement had many legitimate objectives. The government sought to protect the taxpayers' interest, without protracted litigation, in collateral to which they had more than a colorable claim. Indeed, the district court later found that FmHA was entitled to a portion of the Ferris cow proceeds approximating the amount of FmHA's settlement offers to BJC. While we emphasize that FmHA's use of summary debarment was an improper method to coerce settlement of the Ferris cow dispute, the government's legitimate reasons for seeking settlement in the first place constitute another distinction between the present case and the retaliatory prosecution cases upon which BJC relies.*

---

* In its petition for rehearing, BJC directs the court's attention to *Matzker v. Herr,* 748 F.2d 1142 (7th Cir.1984). In that case, the court held that a prison official could be held liable for damages where the official refused to transfer a prisoner to a safer cellblock solely because the prisoner complained to a judge about being kept in segregation. 748 F.2d at 1150-51. We be-

In conclusion, the district court properly found that appellees were entitled to qualified immunity on BJC's First Amendment claim, because the law was not clearly established that summary debarment of a government contractor in order to coerce favorable settlement of a civil dispute would infringe upon the contractor's First Amendment right of access to the courts.

Nonetheless, the link between appellees' actions and BJC's First Amendment rights is tenuous at best. Appellees' actions did not in fact dissuade BJC from fully defending its position in the Ferris cow dispute. The penalty of debarment in this case was not so severe as to infringe upon BJC's First Amendment rights in any way. More importantly, to prevail on its First Amendment claim, BJC must demonstrate that appellees' actions violated BJC's clearly established First Amendment rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The connection between appellees' actions and BJC's First Amendment rights is far too attenuated to overcome appellees' official immunity.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

GODBOLD, Senior Circuit Judge, specially concurring:

I concur in the court's opinion insofar as it affirms the conclusion reached on summary judgment that BJC suffered no loss of property· interest.

I concur in the decision that no liberty interest was denied. I do so because plaintiff did not demonstrate the kind of injury to support a liberty interest. Its evidence showed only that it lost the benefit of the

particular government loan program. BJC did not prove that its loan-making ability was impaired in other respects (or in general) or that its banking activities other than the making of government guaranteed loans was injured.

I concur in the decision concerning alleged denial of right of access to the courts. The defendants tried to force the bank to settle the dispute concerning the cows before suit was filed, by using as a lever the threat of cutting off loan guarantees. This court's opinion recognizes that this was improper. But the attempt was unsuccessful. The agency filed suit against the bank, and the case was tried. BJC did not lose the benefit of access to the courts but rather, as a defendant, enjoyed the benefit of the court as a forum in which to settle its dispute.

lieve that *Matzker* does not compel a different result in this case for the same reasons that the retaliatory prosecution cases are distinguishable. Reasonable, objective public officials in appellees' position could not have been expected to analogize a case about prisoners' rights to the situation of a bank involved in a financial relationship with the government. Moreover, as in

the retaliatory prosecution cases, the prison officer in *Matzker* had no legitimate purpose in seeking to force the prisoner to abandon his claim. In the present case, as discussed above, appellees sought to settle the Ferris cow dispute for legitimate reasons involving their duty to protect the public fisc.