**CAPITOL MORTGAGE BANKERS, INC., Plaintiff,**

v.

**Andrew M. CUOMO, et al., Defendants.**

**No. MJG–99–2907.**

United States District Court,
D. Maryland.

Oct. 25, 1999.

Joseph F. Yenouskas, Weiner, Brodsky, Sidman & Kider, P.C., Washington, DC, for Plaintiff.

Charles J. Peters, Assistant United States Attorney, Baltimore, MD, Sylvia Kaser, United States Department of Justice, Washington, DC, for Defendants.

GARBIS, District Judge.

This case was submitted to the Court for decision upon an agreed record.[1] The Court has reviewed the exhibits, considered the materials submitted by the parties, and had the benefit of the arguments of counsel. The Court now issues this Memorandum of Decision as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

As discussed herein, Plaintiff Capitol Mortgage Bankers, Inc. ("Plaintiff" or "Capitol") brought this action under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (the "APA"), to review a final action by the United States Department of Housing and Urban Development ("HUD") terminating Capitol's loan-origination approval authority. For the reasons stated herein, the Court concludes that HUD's action was taken pursuant to a regulation promulgated contrary to statutory authority. The Court further concludes that even if there had been authority to issue a termination regulation of the type at issue, the regulation would deny Capitol its right to due process. Accordingly, the Court shall set aside the termination of Capitol's loan-origination approval authority.[2] Of course, this judicial action does not affirmatively require HUD to maintain Capitol's approval. Therefore, it is possible that HUD could, on proper grounds and pursuant to proper procedures, terminate Capitol's authority in the future.

1. The parties, agreeing that there were no issues of fact, submitted the case for decision on the record as presented on cross motions for summary judgment.

2. *See* 5 U.S.C. § 706(2)(C) (court may set aside agency actions that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

## I. BACKGROUND

At all times relevant hereto, Capitol has been engaged in the business of providing residential mortgage loans to home buyers and home owners. Capitol originated mortgages insured by the Federal Housing Administration ("FHA") of HUD from various branch offices.

On May 12, 1999, by Mortgagee Letter 99–15, HUD notified all approved mortgagees that it would "be using its regulatory authority to terminate lenders' authorization to originate single family loans ... in geographic areas where the lender has a high rate of early defaults and claims." Admin. Record at 4. In a letter dated June 4, 1999 (the "June 4 letter"), HUD informed Capitol that the company had an early default-claim [3] rate that was 362% to 628% higher than the default-claim rate for other lenders in the relevant geographic areas on FHA loans originated in the twenty-four months ending on March 1, 1999. *Id.* at 1–2. That is, Capitol's default-claim rate exceeded the HUD field-office rate and the national rate. The June 4 letter notified Capitol that HUD intended to terminate Capitol's authorization to originate HUD-insured loans for all of Capitol's branch offices within three field-office jurisdictions of HUD, namely, Washington, D.C., Baltimore, Maryland, and Richmond, Virginia. *Id.*

Further, the June 4 letter stated that Capitol had thirty days to submit a written explanation of its default-claim rate and to request an informal conference. *Id.* at 2. In response, Capitol submitted a written explanation and met with HUD representatives in an informal conference on July 29, 1999. *Id.* at 219. Ultimately, HUD officials concluded that Capitol had not

3. A default occurs when a borrower falls behind in meeting mortgage obligations. A claim occurs when the default is uncorrected and a claim is made against the mortgage insurance.

demonstrated that it should be permitted to originate loans. *Id.* Accordingly, on September 15, 1999, HUD terminated Capitol's loan-origination approval authority for Capitol offices[4] pursuant to 24 C.F.R. § 202.3 (the "Termination Regulation").[5] *Id.* at 220.

Capitol brought the instant lawsuit on September 24, 1999 to seek relief under the APA. On October 6, 1999, Capitol filed the First Amended Complaint challenging HUD's action on the following grounds:

- HUD exceeded its authority under Section 533 of the National Housing Act ("NHA"), 12 U.S.C. § 1735f–11, in issuing the Termination Regulation.
- HUD's Termination Regulation violates Section 1708 of NHA, which established the Mortgage Review Board.
- HUD deprived Capitol of due process of law by the manner in which it terminated Capitol's origination approval agreement.
- HUD's action was arbitrary and capricious.

On October 12, 1999, both sides filed Motions for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Upon being briefed, the court heard oral arguments on the motions on October 21, 1999. At the hearing, the parties agreed that there were no issues of fact and submitted the case for decision on the record. Accordingly, the Court shall deny the parties' Motions for Summary Judgment as moot and issue a ruling on the submitted case as a stipulated bench trial.

4. *See* 64 Fed.Reg. 51136 (Sept. 21, 1999) (listing Capitol as one of thirty-three mortgagees and/or branch offices of mortgagees whose Original Approval Agreement ["OAA"] was terminated by HUD).

5. Under this regulation, every three months, HUD Secretary will review the number of defaults and claims on mortgages originated by each mortgagee within the geographic jurisdiction of a particular HUD field office. 24 C.F.R. § 202.3(c)(2)(I). If a mortgagee has a default-claim rate on insured mortgages that exceeded 200% of the normal rate, and exceeded the national rate, the Secretary may

## II. *LEGAL STANDARD*

The Supreme Court has developed a two-part test for determining whether agency action exceeded its statutory authority and, therefore, should be set aside under APA:

> When a court review an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. . . .
>
> [I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Thus, an administrative agency's interpretation of a statute is not entitled to deference where it is contrary to the unambiguously expressed intent of Congress. *MCI Telecommunications Corp. v. AT & T,* 512 U.S. 218, 229, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994); *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992).

## III. *DISCUSSION*

The Court shall discuss two principal issues[6] in this case. First, whether HUD

notify the mortgagee that its Origination Approval Agreement will be terminated 60 days after notice is given. *Id.* § 202.3(c)(2)(ii)(A). The "normal rate" is defined as "the rate of defaults and claims on insured mortgages for the geographic area served by a HUD field office ... in which a mortgagee originates mortgages." *Id.* § 202.2.

6. Plaintiff also presented other arguments to support its position. *See supra* § I. The Court need not address these arguments because the bases discussed herein provide independent grounds for a ruling in favor of Plaintiff.

exceeded its statutory authority in promulgating the Termination Regulation upon which the agency based its decision to terminate Capitol's loan-origination authority. Second, if HUD had acted within its statutory authority, whether Capitol received due process in accordance with the Fifth Amendment to the United states Constitution. The Court shall address each issue in turn.

## A. *Scope of HUD's Statutory Authority*

The Court's discussion begins with the fundamental principle that "[w]hen Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted." *Stark v. Wickard,* 321 U.S. 288, 309, 64 S.Ct. 559, 88 L.Ed. 733 (1944); *see also Lyng v. Payne,* 476 U.S. 926, 937, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986) ("[A]n agency's power is no greater than that delegated to it by Congress."). Moreover, "there is no place in our constitutional system for the exercise of arbitrary power, and, if [an agency] has exceeded the authority conferred upon [it] by law, then there is power in the courts to restore the status of the parties aggrieved by such unwarranted action." *Garfield v. United States,* 211 U.S. 249, 262, 29 S.Ct. 62, 53 L.Ed. 168 (1908).

The Fourth Circuit stated in *Adams v. Dole* that "in every case which turns on statutory construction," the Court shall "begin with the language of the statute." 927 F.2d 771, 774 (4th Cir.1991) (citation omitted). In this case, the boundaries limiting HUD's authority appear in Section 533 of the NHA, 12 U.S.C. § 1735f–11 ("Section 533" or "Section 1735f–11"). Section 1735f–11, captioned "Direction to Secretary to require mortgagees with above normal rates of early, serious defaults and claims to submit reports and take corrective action," provides a specific, mandatory procedure for HUD to reduce losses under the FHA loan insurance program caused by an excessive rate of early serious defaults and claims.

Specifically, subsections 1735f–11(a) and (b) provide:

(a) To reduce losses in connection with mortgage insurance programs under this Act, the Secretary *shall* review, at least once a year, the rate of early serious defaults and claims involving mortgagees approved under this Act. On the basis of this review, the Secretary *shall* notify each mortgagee which, as determined by the Secretary, had a rate of early serious defaults and claims during the preceding year which was higher than the normal rate for the geographic area or areas in which that mortgagee does business. In the notification, the Secretary *shall* require each mortgagee to submit a report, within a time determined by the Secretary, containing the mortgagee's (1) explanation for the above normal rate of early serious default and claims; (2) plan for corrective action, if applicable, both with regard to (A) mortgages in default; and (B) its mortgage-processing system in general; and (3) a timeframe within which this corrective action will be begun and completed. If the Secretary does not agree with this timeframe or plan, a mutually agreeable timeframe and plan will be determined.

(b) Failure of the mortgagee to submit a report required under subsection (a) within the time determined by the Secretary or to commence or complete the plan for corrective action within the timeframe agreed upon by the Secretary may be cause for suspension of the mortgagee from participation in programs under this Act.

12 U.S.C. § 1735f–11(a)—(b) (emphases added). The steps mandated by the foregoing statutory language provide a basis for measuring HUD's actions for conformity to the agency's legislative grant.

The first step required by Section 1735f–11 is for HUD to conduct an annual review of default and claim data. The second mandatory step is that, after serious defaults and claims involving mortgag-

ees have been determined, HUD must notify the mortgagee of the agency's findings and provide the mortgagee with an opportunity to submit an explanation and a corrective action plan.

Under these specific and unambiguous mandates, HUD is not free to terminate a mortgagee's origination approval agreement due to an excessive default and claim rate without affording the mortgagee a chance to submit a corrective action plan. Here, HUD sidestepped the statutory mandate by enacting a regulation that grants HUD power to terminate a lender's loan-origination capability whenever the agency deems it appropriate in view of the default and claim rate.

The Government argues that section 1735f–11 is inapplicable because HUD promulgated the Termination Regulation pursuant to a broad grant of statutory authority under 12 U.S.C. §§ 1703, 1709, 1715, and 42 U.S.C. § 3535.[7] While these broad statutory provisions may provide a basis for HUD's enacting regulations in other appropriate contexts to carry out its mission, where, as here, Congress has spoken directly on a regulatory subject, HUD may not disobey Congress' clear intent. In this case, Congress specifically addressed the subject of reducing losses in connection with HUD-administered mortgage insurance programs by virtue of excessive default and claim rates. Under section 1709(r) of the NHA, "[t]he [HUD] Secretary shall take appropriate actions to reduce losses under the single-family mortgage insurance programs[,] . . . [and s]uch [appropriate actions] shall include . . . an annual review by the Secretary of the rate of early serious defaults and claims, in accordance with section 1735f–11 [discussed above]."

In spite of Congress' specific legislation on the topic, HUD, in issuing the Termination Regulation in 1991, granted itself the power to terminate a lender's ability to originate FHA loans if HUD concluded that the lender had a higher-than-normal default and claim rate. While HUD may, in an appropriate context not presented in this case, terminate a mortgagee's loan-origination authority, HUD may not simply terminate that authority if the only ground for its action is the mortgagee's having higher-than-normal default-claim rate. Indeed, recognizing that the defaults and claims may not be a direct result of any mortgagee wrongdoing,[8] Congress directed HUD to cooperate with the lenders in addressing the problem. That Congress intended this procedure to be a cooperative process is manifested by the requirement that the Secretary and the mortgagee come up with a "mutually agreeable" corrective action plan and timeframe for implementing that plan if the Secretary did not agree with the mortgagee's proposed plan and timeframe. See 12 U.S.C. § 1735f–11(a)(3) ("If the Secretary does not agree with [the] timeframe or plan, a mutually agreeable timeframe and plan will be determined.").

In short, Congress enacted a legislative directive in 12 U.S.C. § 1735f–11, using mandatory language that did not permit HUD to terminate a lender's loan-origination authorization but rather directed HUD (1) to conduct an annual review of the lender's default and claim rates, (2) to provide notice to any lenders whose loans had higher default-claim rate than the normal rate, and (3) to afford such a lender the opportunity to submit a report to HUD explaining its higher-than-normal rates and proposing a corrective action plan.

7. See, e.g., 12 U.S.C. § 1715b ("The [HUD] Secretary is authorized and directed to make such rules and regulations as may be necessary to carry out the provisions of this [statute]."); 42 U.S.C. § 3535(d) (HUD Secretary "may make such rules and regulations as may be necessary to carry out his functions, powers, and duties").

8. See H.R. Conf. Rep. No. 100–426 at 211–212 (1987) (Congress' intent was that "in areas where the above normal rate of default is due to economic downturns, a corrective action plan of action should not be imposed since the defaults would not be related to a mortgage[e]'s practices or procedure").

HUD's Termination Regulation is directly inconsistent with, and exceeded its authority under, this specific statutory mandate.

The Government claims that "it is within the discretion of the Secretary to decide whether to require a plan for corrective action from a mortgagee." Def's Mem. at 2. HUD rests its argument on the "if applicable" language contained in section 1735f–11, contending that requiring a corrective action plan "is not a mandatory remedy for excessive default and claim rates," and that HUD is free to terminate lenders instead. Def's Mem. at 13–14. HUD's contention fails as a matter of statutory construction.

■ In interpreting congressional statutes, courts are required to give words used in the statute their "ordinary or natural meaning." *FDIC v. Meyer,* 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). The word "applicable" here connotes that a corrective action plan is capable of being applied,[9] *not* that a plan may be ignored and replaced instead by termination of a lender. The Court does not read the words "if applicable" as granting HUD discretion to render inapplicable a specific statutory procedure and to replace that procedure with another, under which HUD may terminate a lender's loan-origination capability without providing an opportunity to submit a corrective action plan and cooperatively seek agreement with HUD.

The Court's statutory construction is buttressed by Congress' and HUD's own views about the "if applicable" language expressed in 1987 and 1990, respectively. Congress enacted Section 1735f–11 as part of the Housing and Community Development Act of 1987, Public Law No. 100–242 ("the Act"). According to the House Con-

ference Report for the Act's amendment, the new statute

> directed the Secretary to review annually the rates of early serious defaults and claims involving lenders under the National Housing Act and to require lenders experiencing a rate of early defaults and claims that are higher than normal for the geographic area in which the lender does business to submit a report that would (1) explain the reasons for the high rate and (2) set forth a plan and timetable for corrective action.

H.R. Conf. Rep. No. 100–426 at 211–212 (1987).

HUD similarly embraced this view of the statute in 1990, when HUD issued a regulation implementing the terms of the statute shortly after Congress enacted Section 1735f–11.[10] This regulation tracks the statutory language and allows lenders to submit corrective action plans. The regulation contains no provision allowing HUD to terminate a lender's approval authority. Further, in its *Federal Register* notice promulgating the regulation, HUD stated that Section 1735f–11 imposed a "specific statutory directive" on the agency. 55 Fed.Reg. 18,869 (May 7, 1990). HUD explained its position on corrective action plans as follows:

> [A] mortgagee must, if notified by the Commissioner that it had a rate of early serious defaults and claims . . ., submit a report to the Commissioner within 60 days. The report must contain an explanation for the above normal rate of early serious defaults and claims and, if applicable, a plan for corrective action with regard to mortgages in default and its mortgages processing system in general. *If a mortgagee determines that no*

---

9. *See American Heritage Dictionary* 63 (1980) ("applicable" refers to something that is "capable of being applied").

10. *See* 24 C.F.R. § 202.12(c) ("If a mortgagee approved for participation in Title II programs is notified by the Secretary that it had a rate of defaults and claims on HUD-insured mortgages during the preceding year, or during recent years, which was higher than the normal rate, it shall submit a report, within 60 days, containing an explanation for the above-normal rate of defaults and claims, and, if required by the Secretary, a plan for corrective action with regard to mortgages in default and its mortgage processing system in general.").

*corrective action is necessary, it must explain the reason why such action is not required.* It shall be at the discretion of the Commissioner to require a corrective plan irrespective of a mortgagee's explanation for the above rate of early serious claims and defaults.

*Id.* at 18,869 (emphasis added). Thus, both Congress' and HUD's contemporaneous construction of the statute makes it clear that the "if applicable" term refers to a situation in which no corrective action plan would be possible because, for example, nothing the mortgagee could possibly do would be effective.

■ The Government argues, alternatively, that it had power to enact the Termination Regulation pursuant to its inherent regulatory authority. While federal agencies possess general authority to regulate matters within their jurisdiction, an agency may not use its inherent regulatory authority to override specific congressional mandates contained in the agency's governing regulation.[11]

In this case, Congress defined with specificity the procedure HUD was to undertake in addressing serious default-claim rates. Thus, HUD's "rulemaking power is limited to adopting regulations to carry into effect the will of Congress as expressed in the statute." *Board of Governors of Federal Reserve v. Dimension Financial Corp.,* 474 U.S. 361, 374, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986). The Court "can always 'ascertain whether the will of Congress has been obeyed' ... and can

enforce adherence to statutory standards." *INS v. Chadha,* 462 U.S. 919, 953 n. 16, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (citations omitted). An administrative agency's interpretation of a statute is not entitled to deference where, as here, the interpretation is contrary to unambiguously expressed intent of Congress. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also MCI Telecommunications Corp. v. AT & T,* 512 U.S. 218, 229, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994); *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992). Because HUD exceeded its authority under Section 1735f–11 in enacting the Termination Regulation, the regulation shall be set aside.[12]

## B. *Due Process*

■ Where the government seeks to deprive someone of a property or liberty interest protected by due process, due process demands that certain procedural safeguards be provided. *See Vitek v. Jones,* 445 U.S. 480, 495–96, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). Whether an administrative process provides adequate procedural safeguards depends upon the balancing of three factors: (1) the private interest affected by agency action; (2) the risk of error; and (3) the government's interest. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The Court shall discuss each element in turn.

11. *See, e.g., Killip v. OPM,* 991 F.2d 1564, 1569 (Fed.Cir.1993) ("An agency is but a creature of statute. Any and all authority pursuant to which an agency may act ultimately must be grounded in an express grant from Congress.... Though an agency may promulgate rules or regulations pursuant authority granted by Congress, no such rule or regulation can confer on the agency any greater authority than that conferred under the governing statute.") (citations omitted).

12. The Court notes that invalidating the Termination Regulation will not hinder HUD's regulatory objectives. HUD had enacted, before issuing the Termination Regulation, an-

other regulation that reflected the statutory mandates delineated by Congress in Section 1735f–11. *See* 24 C.F.R. § 202.12(c) ("If a mortgagee approved for participation in Title II programs is notified by the Secretary that it had a rate of defaults and claim on HUD-insured mortgages during the preceding year, or during recent years, which was higher than the normal rate, it shall submit a report, within 60 days, containing an explanation for the above-normal rate of defaults and claims, and, if required by the Secretary, a plan for corrective action with regard to mortgages in default and its mortgage processing system in general.").

### 1. Capitol's Interest

Capitol originates loans and does not service them. Pl's Opposition at 20. FHA lending constitutes the bulk of the company's lending business. *Id.* HUD's termination would eliminate Capitol's ability to originate FHA-insured loans for six months. The termination may force Capitol to close its business and terminate approximately 200 employees. Consequently, HUD's action could have a detrimental impact upon Capitol and its employees.

Moreover, Capitol has both a property interest and a liberty interest at stake. As to the property interest, Capitol has "a legitimate claim of entitlement" in the Original Approval Agreement ("OAA"), a source independent of the Constitution. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); 24 C.F.R. Part 202 (creating the means by which lenders make loans insured by the FHA). Regarding the liberty interest, termination of Capitol's ability to originate FHA-insured loans, and HUD's publication concerning thereof, carry a stigma that can deprive Capitol of liberty. *See Bank of Jackson County v. Cherry,* 980 F.2d 1362, 1367 (11th Cir.1993) (citing *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) ("[Liberty] denotes not merely freedom from bodily restraint, but also the right to contract [or] to engage in any of the common occupations of life[.]")). Therefore, the private interest being affected by an agency action is significant here.

### 2. Risk of Error

The agency decision in this case involved analysis of various data, including historical data concerning Capitol's loans. The factual nature of such analysis presents a high risk of erroneous deprivation of Capitol's interest. Under these circumstances, an "informal hearing" that Capitol received was not commensurate with the potential harm that Capitol might suffer. Due process, at a minimum, requires notice and an opportunity for a hearing appropriate to the nature of the case. *Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Procup v. Strickland,* 760 F.2d 1107, 1109–10 n. 2 (11th Cir.1985) (citing *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)) ("[T]he standard for measuring the adequacy of these procedural protections increases in proportion to the significance of the interest at stake."). Capitol did not have an opportunity to review HUD's analyses at a hearing on the record, to present witnesses who could provide alternative interpretations of HUD's analyses, to question the officials who performed the analyses to ascertain whether proper methodologies were used, and to explain how certain mitigating factors might have rendered HUD's data an improper basis for adverse action. In light of the nature of the interests involved, Capitol was entitled to a *de novo* hearing with basic procedural safeguards.[13]

### 3. HUD's Interest

The government's interest, including minimizing administrative burdens, should also be considered. While adding additional procedural safeguards to the process would be burdensome, in this case, HUD already provides basic due-process protections to lenders through its Mortgage Review Board ("MRB"). Under 24 C.F.R. § 25.9(x),[14] MRB has express power to

---

13. *See Greene v. McElroy,* 360 U.S. 474, 508, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (agency must afford safeguards of confrontation and cross-examination in terminating employee's job); *Myers & Myers, Inc. v. United States Postal Service,* 527 F.2d 1252, 1259 (2d Cir. 1975) (agency cannot bypass regulations providing for procedural safeguards in debarment actions by giving another label to its action); *Horne Brothers, Inc. v. Laird,* 463 F.2d 1268, 1270–71 (D.C.Cir.1972) (agency suspending contractor for more than one month must offer an opportunity to confront his accusers and rebut the "adequate evidence" against him).

14. This regulation provides that "[a]ny administrative sanction imposed [by MRB] shall be based upon one or more of the following grounds: ... (x) Failure to submit a report

take action against a lender for higher-than-normal default and claim rates, the same ground used by HUD to take action against Capitol in this case. Because basic procedural safeguards already exist under the MRB process, providing a *de novo* hearing with the right to present witnesses and to cross-examine HUD witnesses would not be burdensome to the agency. In short, full procedural protections must be afforded before HUD takes adverse action against important interests, such as the property and liberty interests in this case.

In view of the above discussion, the Court concludes that even if the Termination Regulation were statutorily permitted, Capitol was deprived of due process under the Fifth Amendment because HUD terminated Capitol's loan-origination authorization through an informal conference by a Secretary designee rather than affording Capitol the protections available under the MRB process.

## IV. *CONCLUSION*

For the foregoing reasons:

1. This case has been resolved upon a stipulated record.

2. The Court concludes that:

a. The HUD Regulation at 24 C.F.R. § 202.3 is invalid.

b. The letter dated September 15, 1999 from Frederick C. Douglas, Jr. to Capitol purporting to terminate Capitol's Origination Approval Agreement is set aside.

c. Capitol is hereby returned to the same position that it occupied as an approved lender prior to the issuance of said letter.

required under 24 C.F.R. § 202.12(c) [the regulation implementing section 1735f–11] within the time determined by the [FHA] Commissioner, or to commence or complete a plan

for corrective action under that section within the time agreed upon by the Commissioner." *Id.*