**Glenn E. HOLMES, d/b/a Holmes Bi-Rite Supermarket, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 93–D–165–E.**

United States District Court,
M.D. Alabama,
Eastern Division.

Oct. 18, 1994.

Ben A. Fuller, Prattville, AL, Alvin T. Prestwood, Montgomery, AL, for plaintiff.

Kenneth E. Vines, Asst. U.S. Atty., Steven J. Youngpeter, Office of Gen. Counsel, Montgomery, for defendant.

## MEMORANDUM OPINION

DE MENT, District Judge.

This matter is before the court on plaintiff's Complaint for judicial review of a permanent disqualification penalty issued by the United States Department of Agriculture. The Complaint was filed pursuant to 7 U.S.C. § 2023. A non-jury hearing was held on March 3, 1993. After considering all the evidence and memoranda of counsel, the court affirms the penalty.

## FACTS

The plaintiff, Glenn E. Holmes, owns and operates Holmes Bi–Rite Supermarket ("Bi–Rite"), a grocery store located in Tuskegee, Alabama. The store was originally authorized to participate in the food stamp program by the Food and Nutrition Service ("FNS") on March 9, 1990.[1]

FNS conducted a compliance investigation of Bi–Rite from July 13, 1992, to September 11, 1992, wherein an undercover agent on four occasions traded food stamps for cash in violation of the food stamp statute and regulations.[2] The investigation revealed that the undercover aide sold $450.00 in food stamps to Denise Hall, a store cashier, in return for $165.00 in cash.

In a letter dated September 30, 1992, FNS notified Holmes that Bi–Rite was being considered for permanent disqualification from participating in the food stamp program because of the four trafficking violations committed by Hall. The letter informed Holmes that his store could qualify for a $40,000.00 civil money penalty in lieu of permanent disqualification if the store had an effective policy and program in effect to prevent violations, and if certain other criteria were established, i.e., that neither the store's management or ownership were involved in the violations.

Holmes did not request the money penalty. Instead, he denied the allegations made by the government maintaining that Hall did not purchase any food coupons on the occasions in question. He was concerned that opting for the money penalty would signify an admission of liability.

On October 14, 1992, FNS notified Holmes that it was permanently disqualifying Bi–Rite from participating in the food stamp program. Holmes then requested and received an administrative review of the decision. A stay of the disqualification was instituted pending administrative review. An administrative hearing was held on December 2, 1992, before Edward W. Davidson, Administrative Review Officer. On January 22, 1993, Davidson issued his determination sustaining the permanent disqualification of Bi–Rite.

Holmes then filed this civil action for a *de novo* review of the agency decision pursuant to 7 U.S.C. § 2023. He also requested a stay of the permanent disqualification pursuant to § 2023 pending review by this court. On February 23, 1993, a hearing was held on the plaintiff's stay request. The court granted the stay finding that Holmes would be irreparably harmed and that he had a likelihood of prevailing on the merits. Furthermore, the court had serious concerns as to whether a statute which imposes strict liability on a storeowner with no recourse to him or her to prove his or her innocence violates the Due Process clause of the Fifth Amendment. *Holmes v. United States*, 815 F.Supp. 429, 432 (M.D.Ala.1993).

On March 3, 1993, a final evidentiary hearing was held. The parties briefed the constitutional issues raised by the court, and a final oral argument was held on January 12, 1994.

## CONTENTIONS OF THE PARTIES

Holmes argues that the trafficking transactions did not occur at his store as alleged by the government. In the alternative, he

---

1. The food stamp program is administered by the Food and Nutrition Service, an agency of the United States Department of Agriculture. The food stamp program is authorized by the Food Stamp Act, 7 U.S.C. § 2011, *et seq.*

2. A retail store may accept food coupons only in exchange for eligible food items. 7 C.F.R. § 278.2(a). Coupons may not be accepted in exchange for cash, except when cash is returned as change in a transaction in which coupons were accepted in payment for eligible food. *Id.* The buying and selling of food coupons for cash is defined in the regulations as trafficking. 7 C.F.R. § 271.2.

argues that the penalty provisions of the statute violate both procedural and substantive due process under the Fifth Amendment of the United States Constitution as applied to "innocent" owners.[3] The government, on the other hand, contends that the proscribed penalties are constitutional. The government further maintains that the violations did occur; thus, the penalty is required by law.

## STATUTORY BACKGROUND

The Food Stamp Act of 1977, as amended, 7 U.S.C. §§ 2011–2029, was enacted "to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." Congress found that the limited purchasing power of low-income households contributed to hunger and malnutrition. Thus, Congress created the food stamp program to permit low-income households to obtain a nutritious diet through normal channels of trade by increasing the food purchasing power for all eligible households. See 7 U.S.C. § 2011. Under the Act, households with combined incomes below a certain threshold may apply for participation in the food stamp program. See 7 U.S.C. § 2014. Participating households receive an allotment of food stamp coupons to buy food at approved retail food stores. See 7 U.S.C. §§ 2016(b), 2018.

In order to be authorized to accept and redeem coupons, a store[4] must submit an application to the Department of Agriculture. See 7 U.S.C. § 2018(a). Approval of a store's application is based upon a number of factors, such as the nature and extent of the store's food business, the volume of coupon business which the store may reasonably be expected to conduct, and the store's business reputation and integrity (ibid.). Once a store obtains a certificate of approval, it may accept food stamps as payment for food. The store is prohibited, however, from exchanging food stamps for cash. 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.2(a).

The Act imposes severe sanctions against stores that violate the statute or regulations. See 7 U.S.C. § 2021. Under the statute, "trafficking", i.e., the buying or selling of food stamps for cash, is a particularly serious offense: The statute requires that a participating food store be permanently disqualified from further participation in the food stamp program unless the Secretary of Agriculture determines that the store had an effective policy and program in effect to prevent violations of the Act and implementing regulations. In such case, the Secretary has the discretion to impose a civil money penalty in lieu of disqualification. See 7 U.S.C. § 2021(b)(3)(B).

## DISCUSSION

### I. *Occurrence of the violations*

 The threshold issue in this *de novo* review is whether the trafficking violations occurred as alleged by the government. The plaintiff has the burden of proof to show by a preponderance of evidence that the transactions did not occur. *Redmond v. United States,* 507 F.2d 1007, 1011–12 (5th Cir.1975); *Goodman v. United States,* 518 F.2d 505, 507 (5th Cir.1975).

At trial, several government witnesses testified. The FNS investigative aide testified that an employee of Bi–Rite, who worked at the cash register, purchased food coupons from him for cash on four separate occasions. He identified Denise Hall as that employee.

The FNS investigator's testimony supported the trafficking allegations. The investigator testified that before the aide entered the store he was searched for both money and food coupons. The aide was then supplied with coupons. He also testified that on each occasion the aide returned to his presence immediately after departing the store with cash in his possession. The investigator then completed a written report of the trafficking transactions. The reports were admitted into evidence, and the testimony of

---

**3.** The term "innocent" is used to define a storeowner who was not aware of, approved, or benefitted from trafficking violations committed by employees.

**4.** The Food Stamp Act and the implementing regulations are written in terms of "retail food store" and make no distinction as to the nature of ownership, whether corporate, partnership, individual or unincorporated association.

both witnesses was consistent with the reports.

The plaintiff was unable to demonstrate any inaccuracies or inconsistencies in the government witnesses' testimony which cast doubt on their credibility. The plaintiff presented Denise Hall who testified that she had never purchased food coupons at Bi–Rite. The Court finds that her testimony, however, is not credible. Based upon the evidence and testimony presented, the court finds and concludes that the plaintiff has failed to show by a preponderance of the evidence that the transactions did not occur.

## II. *Innocent Owner Defense*

■ FNS, relying upon 7 U.S.C. § 2021(b)(3)(B), permanently disqualified Bi–Rite from the food stamp program.[5] Holmes maintains that the statute does not authorize such a harsh penalty on innocent storeowners. This court is convinced, however, after examining the clear language and legislative history of § 2021(b)(3), that Congress intended the penalty to apply.

The Food Stamp Act states generally that a retail food store may be disqualified from participation if "such store" violates any provision of the Act or implementing regulations. 7 U.S.C. § 2021(a). In 1982 Congress amended the statute by specifically providing periods of disqualification, including a permanent disqualification penalty for trafficking.[6] Congress, in an attempt to curb the increasing frequency of reported trafficking cases, authorized the permanent disqualification penalty. S.Rep. No. 504, 97th Cong., 2d Sess. 63–64, *reprinted in* 1982 U.S.Code Cong. & Admin.News 1641, 1701–02.

FNS interpreted the statute's new permanent disqualification penalty as applying to grocery stores regardless of the owner's involvement or benefit from the trafficking activity. Thus, FNS issued a regulation which provided for the permanent disqualification of a firm if "[p]ersonnel of the firm have trafficked [in coupons]...." 7 C.F.R. § 278.6(e)(1)(i).

In *R Ranch Market Corp. v. United States*, 861 F.2d 236 (9th Cir.1988), upon which Holmes relies, the Court of Appeals for the Ninth Circuit struck down the regulation as an impermissible construction of the statute because there was no indication in the statute or its legislative history that Congress intended such a harsh penalty to apply to innocent storeowners. Soon after the *R Ranch* decision, Congress amended § 2021(b)(3) to lessen the harshness of permanent disqualification.

In the 1988 amendment, Congress authorized the Secretary of Agriculture to impose a civil money penalty in lieu of permanent disqualification provided certain criteria were met. 7 U.S.C. § 2021(b)(3)(B). *See supra* n. 6. The legislative history of the amendment is particularly enlightening. Congress was concerned with the lack of an alternative penalty available to FNS in trafficking cases where an employee acted independently and for his own personal profit. 54 Fed.Reg. 18,642–43. In discussing the reasons for the addition of the monetary penalty, it was stated in the legislative report:

> A retail food store or wholesale food concern which has an effective policy and pro-

---

5. **(b) Period of disqualification**

 Disqualification under subsection (a) of this section shall be—
 (3) permanent upon—
 (B) the first occasion or any subsequent occasion of a disqualification based on the purchase of coupons or trafficking in coupons or authorization cards by a retail food store or wholesale food concern, except that the Secretary shall have the discretion to impose a civil money penalty of up to $20,000 for each violation (except that the amount of civil money penalties imposed for violations occurring during a single investigation may not exceed $40,000) in lieu of disqualification under this subparagraph, for such purchase of coupons or

trafficking in coupons or cards that constitutes a violation of the provisions of this chapter or the regulations issued pursuant to this chapter, if the Secretary determines that there is substantial evidence (including evidence that neither the ownership nor management of the store or food concern was aware of, approved, benefitted from, or was involved in the conduct or approval of the violation) that such store or food concern had an *effective policy and program* in effect to prevent violations of the chapter and the regulations; or

6. Prior to 1982 the period of disqualification was left to agency discretion. The FNS regulations provided for a range of disqualifications from thirty days to three years.

gram to prevent trafficking should not be presumptively disqualified from participation in the Food Stamp Program due to the unauthorized or expressly prohibited acts of store personnel.... [I]nnocent persons should not be subject to the harsh penalty of disqualification where a store or concern has undertaken and implemented an effective program and policy to prevent violations.... ***Under current law, no discretion is provided*** to the Secretary of Agriculture to evaluate a store's actions to prevent these violations....

H.Rep. No. 828, 100th Cong., 2d Sess. 28 (1988) (emphasis added).

These comments demonstrate that Congress understood the statute as authorizing permanent disqualification penalties on innocent storeowners. As pointed out by the Court of Appeals for the Third Circuit in *Freedman v. United States Dep't of Agric.*, 926 F.2d 252, 261 n. 13 (3d Cir.1991), the fact that Congress recognized the harshness of the permanent disqualification penalty presupposes that it authorized its imposition in the first place. *Accord, Goldstein v. United States*, 9 F.3d 521, 524 (6th Cir.1993). Thus, innocent owners can be subject to the permanent disqualification penalty. FNS has promulgated regulations in response to the 1988 amendment which allow owners to apply for the monetary penalty. 7 C.F.R. § 278.6(b)(2)(i). If, however, as in this case, the storeowner does not request it, or is found ineligible, FNS must impose the permanent disqualification penalty. 7 U.S.C. 2021(b)(3)(B).

## III. *Due Process Claims*

In its earlier opinion, this court expressed concern that the food stamp statute and implementing regulations might not afford a store owner due process. *Holmes*, 815 F.Supp. at 432. The court is now convinced, however, that neither the statute nor the regulations run afoul of the Constitution.

The Fifth Amendment to the United States Constitution provides in part that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law...." U.S. Const. amend. V. It is clearly established that this clause provides both procedural and substantive due process pro-

tection from actions of the federal government.

### A. *Procedural Due Process*

Holmes asserts that the permanent revocation of his participation in the food stamp program violates procedural due process because he was not given an opportunity to demonstrate his innocence. The three elements that Holmes must establish to prevail on his procedural due process claim are: "(1) a constitutionally protected interest in life, liberty or property; (2) governmental deprivation of that interest; and (3) the constitutional inadequacy of procedures accompanying that deprivation." *Bank of Jackson County v. Cherry*, 980 F.2d 1362, 1366 (11th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 73, 126 L.Ed.2d 42 (1993).

### 1. Property Interest

The Supreme Court has made clear that weighing the significance of the interest at stake to the complainant is not the proper test in determining whether a property right exists. In *Board of Regents v. Roth*, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972), the Court recognized that courts must first look to the "nature" of the interest to determine whether it comes within due process protection. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577, 92 S.Ct. at 2709. The Court went on to state that "[p]roperty interests ... are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

This court previously found, relying upon *Cross v. United States*, 512 F.2d 1212, 1217 (4th Cir.1975), that Mr. Holmes has a property interest in continued participation in the food stamp program. *Holmes*, 815 F.Supp. at 431–32. However, in light of the Eleventh Circuit's holding in *Bank of Jackson County*, the court has reconsidered its earlier ruling.

In *Bank of Jackson County*, after the bank was disqualified from participating in Farmers Home Administration lending programs, it filed suit claiming that it had been deprived of a property interest. The Court, relying upon *Roth*, noted that the Bank had failed to point to any "independent source" of law giving it the right to participate in the loan guaranty program.

> While BJC surely attaches great importance to FmHA loan guaranties, our analysis must focus not upon the weight of BJC's interest, but upon the 'nature' of that interest. [citation omitted.] Simply put, federal law does not create an entitlement to FmHA loan guaranties. Thus, the 'nature' of BJC's interest in such guaranties is 'an abstract need or desire' to obtain them. [citation omitted.] Because BJC is not entitled to FmHA loan guaranties, it has no property interest in them.

980 F.2d at 1366.

The court relied upon *Gonzalez v. Freeman*, 334 F.2d 570, 574 (D.C.Cir.1964), and *Sutton v. United States Dept. of Hous. and Urban Dev.*, 885 F.2d 471, 474 (8th Cir.1989), *cert. denied*, 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1031 (1990), for the proposition that citizens do not have a "right" to do business with the government and that while economic injury is sufficient to confer standing in a suspension or debarment proceeding, it does not create a property interest.

### 2. Process Due

Assuming Holmes has a constitutionally protected property right, it is equally clear that the government has provided Holmes adequate procedures to satisfy the constitutional test. *See* 7 C.F.R. §§ 278.6, 278.8, and pt. 279 (administrative review procedures). In addition, this court's *de novo* review allows Holmes ample opportunity to contest his store's disqualification from the program. Thus, full procedural due process protection is afforded to Holmes. *Redmond v. United States*, 507 F.2d 1007, 1012 (5th Cir.1975); *Haskell v. United States*, 930 F.2d 816, 820 (10th Cir.1991); *Ibrahim v. United States*, 834 F.2d 52, 54 (2nd Cir.1987).

### B. *Substantive Due Process*

■ Holmes argues that § 2021(b)(3) violates substantive due process. He asserts that Congress has overstepped its constitutional authority by holding innocent storeowners responsible for violations of the food stamp program committed by store employees. He claims that the permanent disqualification penalty is too harsh and does not pass constitutional muster.

■ The test in satisfying substantive due process where no fundamental right is involved requires the legislation to have a reasonable relation to a proper legislative purpose and be neither arbitrary nor discriminatory.[7] *Nebbia v. New York*, 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934); *Silver v. Baggiano*, 804 F.2d 1211, 1218 (11th Cir.1986). Any reasonable means of achieving a legitimate government goal will satisfy the mere rational relationship test.

The goal in establishing the food stamp program was to safeguard the health and well being of the nation's population by raising levels of nutrition among low income households. 7 U.S.C. § 2011. The program was instituted in 1964 after Congress determined that the limited food purchasing power of low income families contributed to hunger and malnutrition. *Id.*

As discussed earlier, Congress amended the penalty provisions of § 2021 by authorizing the imposition of the permanent disqualification penalty for trafficking. The widespread sale of food coupons for cash was seen as undermining the goals of the program. The purpose of the penalty was to deter and prevent trafficking activity and, thus, maintain the integrity of the food stamp program. S.Rep. No. 504 at 63, *reprinted in* 1982 U.S.Code Cong. & Administrative News. "These increased penalties are designed to provide the deterrence for those stores which might be inclined to violate the law." *Id.* at 64, *reprinted in* 1982 U.S.Code Cong. & Admin.News, at 1702.

Holmes does not dispute that deterrence is a proper legislative purpose. He maintains, however, that imposing permanent disqualifications on innocent storeowners has no rea-

---

**7.** This is the proper substantive due process analysis because a legislative act is involved. *McKin-* *ney v. Pate*, 20 F.3d 1550, 1557, n. 9 (11th Cir.1994).

sonable relation to that purpose. He argues the goal of deterrence is not served by penalizing a storeowner who had no knowledge of the trafficking, did not benefit from the activity, and did everything possible to prevent the violations from occurring. While the result may seem harsh, the law establishes that an employer may be held accountable for the unlawful acts of his employees.

The Supreme Court has upheld the imposition of liability on a principal for the fraudulent acts of its agent, even when the agent acted solely for his or her own benefit and without the knowledge of the principal. In *American Soc'y of Mechanical Eng'r v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982), such liability was based on the doctrine of "apparent authority," i.e., the agent's position facilitated the consummation of the fraud and he appeared to be acting in the ordinary course of business. As to imposing a substantial penalty on an employer for the acts of its agents, "[o]nly [an owner] can take the systematic steps to make improper conduct on the part of all its agents unlikely, and the possibility of civil liability will inevitably be a powerful incentive for [the owner] to take those steps." *Id.* at 572, 102 S.Ct. at 1946.

More recently, in *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the Supreme Court held that imposing liability upon an employer, under an apparent authority theory, for an employee's fraudulent acts did not violate the employer's due process rights. The Court determined that Alabama's rule of strict liability in the insurance context rationally advanced the state's interest in minimizing fraud because an insurer is more likely to prevent an agent's fraud if given sufficient financial incentive to do so. The Court recognized imposing liability on the party who is in a position " 'to guard substantially against the evil to be prevented' " creates a strong incentive for vigilance by that party. *Id.* at 14, 111 S.Ct. at 1041.

The permanent disqualification penalty set out in 7 U.S.C. § 2021(b)(3) provides a powerful incentive for storeowners to prevent trafficking activity. Storeowners stand in a position of responsibility for the trafficking transactions that occur in their stores, and can substantially guard against such activity. They can assure that their employees are familiar with and adhere to the food stamp regulations. They also can take aggressive measures to promulgate policies, training, and supervision of their employees, and by doing so, prevent violations of the food stamp program.

"Imposing liability without independent fault deters [i.e., trafficking] more than a less stringent rule." *Pacific Mut.*, 499 U.S. at 14, 111 S.Ct. at 1041. How better to combat trafficking activity than to hold the storeowner, who is in the best position to prevent it, ultimately responsible. Congress has decided to take a hard stance against trafficking violations in the food stamp program. The permanent disqualification penalty has a reasonable relation to the congressional purpose of deterring and preventing trafficking.[8] Accordingly, substantive due process is satisfied, and the concerns previously expressed by this court in *Holmes* have been alleviated.

### C. Waiver

■ Moreover, an individual may contractually waive his constitutional right to Due Process. *Miami Tele–Communications, Inc. v. City of Miami*, 743 F.Supp. 1573, 1576 (S.D.Fla.1990) (citing *Erie Telecommunications Inc. v. City of Erie*, 853 F.2d 1084, 1094 (3d Cir.1988); and *Gonzalez v. County of Hidalgo*, 489 F.2d 1043, 1046 (5th Cir.1973)). A waiver is the voluntary relinquishment of a known right. *Id.*

■ Here, the plaintiff was under no compulsion or impetus to participate in the food stamp program. However, when he did so, he accepted the terms and conditions that accompanied the program, one term being his acceptance of responsibility for the acts of

---

8. Arguably, another rationally related proper legislative purpose of the penalty provisions of § 2021(b)(3) in regard to imposing a monetary penalty is that Congress decided to place some of the financial burden of maintaining the integrity of the food stamp program upon those who profit from it. *See United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125 (5th Cir. Unit A Apr. 1981), *cert. denied,* 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981). Thus, in addition to subjecting storeowners to money penalties on a strict liability basis to prevent and deter trafficking, Congress also may constitutionally impose money penalties as a means of shifting the cost of maintaining the program onto storeowners.

his employees without regard to the doctrine of respondeat superior. Specifically, Holmes renewed his application for participation in the program on April 12, 1992. When he signed this application, he contractually agreed to "accept responsibility on behalf of the firm for violations committed by the firm's employees...." The agreement is crystal clear that he waived any reliance on the doctrine of respondeat superior, i.e., that he did not authorize, participate in, ratify, or even benefit from a violation of the regulations.

### CONCLUSION

For the above reasons, judgment is due to be entered in favor of the United States of America and against Glenn E. Holmes, d/b/a Holmes Bi–Rite, affirming the determination made by FNS to permanently disqualify Bi–Rite from participation in the food stamp program. The order staying the disqualification entered by the court in *Holmes v. United States,* 815 F.Supp. 429 (M.D.Ala.1993), is due to be dissolved. A judgment and order will be issued in accordance with this opinion.