Juan Carlos LAZARO, d/b/a Kansas City Meat Market, Plaintiff,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, Defendant.

No. 8:01–CV–744–T–23MSS.

United States District Court, M.D. Florida, Tampa Division.

Aug. 24, 2001.

Anthony J. Parrino, Reynolds & Stowell, P.A., St. Petersburg, FL, for plaintiff.

Patricia A. Willing, U.S. Attorney's Office, Tampa, FL, for defendant.

## ORDER

MERRYDAY, District Judge.

Magistrate Judge Scriven issued a "Report and Recommendation" (Doc. 25) on June 29, 2001, concerning plaintiff's "Motion for Preliminary Injunction" (Doc. 4). Neither party filed objections, and the time for objecting has passed. According-

ly, the Court **ADOPTS** the Report and Recommendation (Doc. 25) and **GRANTS** plaintiff's motion for a preliminary injunction (Doc. 4). Defendant is **ENJOINED** from enforcing its decision to permanently disqualify plaintiff from participating in the Food Stamp Program. The preliminary injunction shall remain in force until further order of this Court.

## REPORT AND RECOMMENDATION

SCRIVEN, United States Magistrate Judge.

THIS COMES before the Court on Plaintiff's motion for a preliminary injunction enjoining the United States Department of Agriculture from enforcing its February 24, 2000 decision to permanently disqualify Plaintiff from participation in the Food Stamp Program and its administrative appellate decision issued April 5, 2001.

## FINDINGS OF FACT AND PROCEDURAL HISTORY

1. Plaintiff operates a business in Tampa, Florida that formerly participated in the Food Stamps and Electronic Benefits Transfers (EBT) program with the United States Department of Agriculture (USDA).

2. On February 4, 2000, Plaintiff received a Letter of Charges from the USDA informing the business that the USDA was seeking permanently to disqualify Plaintiff from participating in the Food Stamp program for two violations of anti-trafficking regulations.[1] Specifically, the USDA reported in a March 2, 2000, amended letter of charges that on August 3, 1999, a male employee of Plaintiff accepted $16.91 in Electronic Benefits Transfer (EBT) proceeds from a confidential informant in exchange for $10 in cash, in violation of 7 U.S.C. § 278.2(a). The USDA also charged that again on August 8, 1999, a female employee of Plaintiff accepted $42.00 in EBT benefits in exchange for $22.00 in cash.

3. On February 24, 2000, USDA informed Plaintiff that he was permanently disqualified from participation in the Food Stamp Program as a result of those two violations.

4. On February 29, 2000, Plaintiff filed a Petition for Preliminary Injunction and Temporary Restraining Order which was assigned to Judge Merryday. Plaintiff was able to demonstrate that on August 8, 1999, the date originally indicated as the date of the second alleged violation, no female employees were on duty as alleged by the letter of charges. Further, no receipts for the day in question showed the transactions alleged. On the basis of this evidentiary proffer made by Plaintiff, the temporary restraining order was granted.

5. It was subsequently determined during the Administrative review that the USDA's first Letter of Charges, dated February 4, 2000, incorrectly charged, however, that the second violation occurred on August 8, 1999. An amended letter of charges, dated March 2, 2000, was subsequently issued indicating the correct date of the alleged violation was August 6, 2000. Conse-

---

1. The Food Stamp Program overseen by the United States Department of Agriculture is codified in the United States Code at 7 U.S.C. § 2011, *et seq.* Pursuant to 7 U.S.C. § 2021, a retail food store can be disqualified from the food stamp program or subjected to a civil money penalty, "on a finding, made as specified in the regulations, that such store or concern has violated any of the provisions of this chapter or the regulations issued pursuant to this chapter." Such disqualification may be for a reasonable period of time, but can be permanent upon "the first occasion of a disqualification ... based on the purchase of coupons or trafficking of coupons." 7 U.S.C. § 2021(b) (2000).

quently, the challenges Plaintiff asserted in seeking the original temporary restraining order no longer serve as the basis for the current challenges. Nevertheless, the agency agreed to continue the effect of the temporary restraining order until Plaintiff could exhaust his administrative remedies.

6. On March 6, 2000, Plaintiff requested an administrative review of the disqualification, and also requested that a civil monetary penalty be imposed in lieu of permanent disqualification pursuant to 7 U.S.C. § 2021(b)(3) (2000).

7. On March 16, 2000, having agreed to stay the effect of the disqualification pending final agency review, the parties filed a stipulation for dismissal of the motion for preliminary injunction, without prejudice to the Plaintiff's right to refile after completion of the administrative review.

8. On April 9, 2001, Plaintiff received notice that the decision to disqualify him had been affirmed by the agency's administrative review officer, and his request for a civil monetary penalty in lieu of permanent disqualification was denied.

9. On April 12, 2001, Plaintiff filed another motion for preliminary injunction and for a temporary restraining order with this Court. The District Judge denied the motion for restraining order, finding that there was no irreparable injury so imminent that notice of a hearing on the motion for preliminary injunction was impractical or impossible.

*DISCUSSION*

In this action and demand for injunctive relief, Plaintiff, Juan Carlos Lazaro, challenges the Department's permanent disqualification of his firm from participating as an authorized food stamp retailer. Plaintiff contends he can show a likelihood of prevailing on the merits of this suit and irreparable injury as required by the statute under which he proceeds, 7 U.S.C. § 2023(a)(17).

The Government responds that this Court is not statutorily empowered to enjoin the disqualification imposed by the USDA. It contends first that § 2023(a)(17) has no application in a case of disqualification for a trafficking violation. Specifically, it argues, pursuant to the Agency's statutory construction, that the applicable statute and regulation expressly prohibit the granting of injunctions in trafficking cases, citing 7 U.S.C. § 2023(a)(18) as well as 7 C.F.R. § 279.10(d).

Additionally, in the alternative, the Government contends that Plaintiff cannot meet the statutory prerequisites for injunctive relief under 7 U.S.C. § 2023(a)(17). Finally, the Government argues that this Court lacks jurisdiction over the named Defendant, previously the USDA, and currently the United States of America.

Having considered the respective positions of the parties and having considered the evidence submitted in support of and in opposition to the motion, the Undersigned finds that the Government's "interpretation" of 7 U.S.C. § 2023(a)(18) is inconsistent with the plain language of the statute. Further, Plaintiff has met the prerequisites for entry of injunctive relief. Finally, there are no statutory or jurisdictional bars to Court action. Accordingly, the Undersigned REPORTS and RECOMMENDS that the motion for injunctive relief be GRANTED.

I. *WHETHER THIS COURT IS STATUTORILY PROHIBITED FROM ENTERING A PRELIMINARY INJUNCTION IN THIS CASE*

■ As noted, Plaintiff brings this action pursuant to 7 U.S.C. § 2023(a)(17), which provides in relevant part:

During the pendency of such judicial review, or any appeal therefrom, the administrative action under review shall be and remain in full force and effect, unless on application to the court ... and a consideration by the court of the applicant's likelihood of prevailing on the merits and of irreparably injury, the court temporarily stays such administrative action pending disposition of such trial or appeal.

Plaintiff contends he can make the requisite showing under the statute and, thus, should be granted injunctive relief.

The Government disagrees and, in support, invokes 7 U.S.C. § 2023(a)(18) which provides in relevant part:

Notwithstanding any other provision of this subsection, any permanent disqualification of a retail food store or wholesale food concern under paragraph (3) or (4) of section 2021(b) of this title shall be effective from the date of receipt of the notice of disqualification. If the disqualification is reversed through administrative or judicial review, the Secretary shall not be liable for the value of any sales lost during the disqualification period.

It further points to 7 C.F.R. § 279.10(d) which provides:

During the pendency of any judicial review, or any appeal therefrom, the administrative action under review shall remain in force unless the firm makes a timely application to the court and after hearing thereon, the court stays the administrative action after a showing that irreparable injury will occur absent a stay and that the firm is likely to prevail on the merits of the case. *However, permanent disqualification actions taken in accordance with § 278.6(e)(1) of this chapter [trafficking provisions] shall not be subject to such a stay of administrative action.* If the disqualification action is reversed through ad-ministrative or judicial review, the Secretary shall not be liable for the value of any sales lost during the disqualification period.

(Emphasis added to highlight that portion of the regulation on which the Agency relies most heavily.)

The Government argues that these provisions of law and regulation, particularly the highlighted portions, divest this Court of its power to afford preliminary injunctive relief against the Agency's actions challenged here. Of course, if the Agency's regulations have the force and effect intended by the Agency in its promulgation, the Agency would be correct. If this were true, other than addressing the constitutional issue of Due Process, the Court's labor would end in this matter.

Plaintiff contends, however, that § 2023(a)(18) is unambiguous and that the Code of Federal Regulations provision on which the Agency relies expands and extends the intent of Congress beyond what is plainly set forth in the statute. He contends that if he can make the requisite showing under § 2023(a)(17)—and he believes he can—this Court is empowered to grant the relief sought. Thus the question for the Court is whether to give effect to the statute in the manner directed by the CFR promulgated by the Agency—that is to agree that this Court is not empowered to grant preliminary injunctive relief to an entity disqualified for trafficking. The parties do not seem to dispute the standard of law applicable to this analysis.

When the Court reviews an agency's construction of a statute administered by that agency, the Court must engage in a two-pronged analysis. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Ilaian v. USDA, FNS,* 87 F.Supp.2d 1047, 1048 (S.D.Cal.2000). First, the Court

must determine whether Congress has directly spoken to the issue. If the intent of Congress is clear, that is the end of the matter. *See Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. If, however, Congress has not directly addressed the issue, and if the statute is silent or ambiguous, the question for the Court is whether the agency's answer is based on a permissible construction of the statute. *See id.* at 843, 104 S.Ct. 2778. Further, it is the duty of the courts to interpret statutory language, and the court should decide whether there is ambiguity in a statute without regard to an agency's prior, or current, interpretation. *See Bank of America v. FDIC,* 244 F.3d 1309, 1319 (11th Cir.2001). Similarly, it is ultimately the function of the judiciary, not an administrative agency, to decide whether Congress spoke directly to the issue. *See id.* at 1320. Finally, in so deciding, the Court does not start from the premise that the statutory language is imprecise. Instead, it assumes that in drafting legislation Congress said what it meant. *Legal Environmental Assistance Foundation, Inc. v. US EPA,* 118 F.3d 1467, 1474 (11th Cir.1997).

The Court has found only two cases that address this issue in the specific context of this statute since it was amended in 1996 to add § 2023(a)(18), on which the Government relies. These are the cases of *Ahmed v. United States,* 47 F.Supp.2d 389 (W.D.N.Y.1999) and *Ilaian v. United States Dept. of Agriculture,* 87 F.Supp.2d 1047 (S.D.Cal.2000). In *Ahmed,* the Court entered a preliminary injunction against a permanent disqualification but did not address the CFR's constructed prohibition against such relief. In *Ilaian,* the District

Judge found the agency's regulation controlling on the issue and denied injunctive relief, implicitly finding the statute ambiguous.[2]

■ For the reasons set forth below, the Undersigned respectfully disagrees with the *Ilaian* court, as well as the Agency's construction. First, following the analysis dictated by controlling precedent, the Undersigned must determine whether Congress has directly spoken to the issue of whether a preliminary injunction may issue to enjoin a permanent disqualification order. "In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation." *FDA v. Brown & Williamson Tobacco Corp. et al.,* 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). Thus, the Court cannot be confined to the specific provision to which the CFR is directed as the Agency suggests. Rather, the Court must look to the statute as a whole to consider whether Congress issued a mandate with regard to the issue at hand. The Undersigned finds that Congress did so in § 2023(a)(17), not 2023(a)(18).

First, in § 2023(a)(17), Congress granted the district courts *de novo* authority to consider a challenge to the Agency's determination here. This is in part due to the truncated and informal nature of the Agency's review at issue. No administrative law judge reviewed the Agency's findings below; rather, the initial and final reviews were conducted by an Agency reviewing officer. Hence, the Court is granted plenary review authority over the

---

**2.** The most recent Eleventh Circuit case addressing the Act is *TRM, Inc. v. U.S.,* 52 F.3d 941 (11th Cir.1995). In reversing the district court's decision below to set aside the disqualification of an "innocent" store owner, the *TRM* court accepted the harsh effect of the strict liability nature of the statute as it relates to the offense of trafficking—an act which the Court suggests erodes the integrity of anti-hunger legislation. *Id.* at 946. The *TRM* court did not, however, discuss whether injunctive relief was permitted on *de novo* review in cases of disqualification for trafficking.

decision. Consistent with that broad grant of review, the Court is granted concomitant authority to stay the Agency determination, but only in those extraordinary cases where the substantial showing required for preliminary injunctive relief can be made by a disqualified entity. *See* 7 U.S.C. § 2023(a)(17) (2000).

Section 2023(a)(18) plainly does not contravene the direct intent and express statement of Congress on this point. The language relied on by the agency provides: "Notwithstanding any other provision to the contrary, any permanent disqualification of a retail food store or wholesale food concern under paragraph (3) or (4) of section 2021(b) of this title [trafficking provisions] shall be effective *from the date of receipt* of the notice of disqualification." 7 U.S.C. § 2023(a)(18) (emphasis added). Read plainly, subsection (a)(18) merely sets the effective date of the disqualification back to the date of receipt of the notice of permanent disqualification. The only provision that is apparently "to the contrary" is § 2023(a)(5), which sets a later effective date for persons disqualified for reasons other than trafficking. Section 2023(a)(5) states that "the Secretary ... shall subject to the right of judicial review hereinafter provided,[3] make a determination which *shall* be final and which *shall* take effect *thirty days after the date of the delivery* or service of such final notice of determination." (Emphasis added). Section 2023(a)(18) sets an earlier effective date for accused traffickers. Thus, if an entity accused of trafficking decides to file an appeal—which it has 30 days to do[4]—it is nonetheless immediately disqualified upon receipt of the notice. The retailer remains disqualified until and unless granted preliminary injunctive relief under § 2023(a)(17) or final relief upon a determination by the Court after *de novo* review. Further, § 2023(a)(18) makes clear that no damages sustained in such interim periods may be charged to the agency. Nowhere does § 2023(a)(18) suggest, state, or imply that Congress intended to remove altogether the Court's authority to grant injunctive relief in appropriate circumstances, even for accused traffickers, under the structure set forth in § 2023(a)(17).

 The Government suggests that the mandatory language of § 2023(a)(18) in setting an effective date for disqualification supports its construction to preclude the grant of injunctive relief. In this regard, Plaintiff correctly points out that § 2023(a)(5), which is directed to non-trafficking cases, states that the Agency's final determination "shall" become effective thirty days after the date of service of the final notice of disqualification. Thus, under the Government's logic this provision too would divest the Court of the authority to grant injunctive relief for non-trafficking cases, in which case § 2023(a)(17) would have no applicability at all. A basic tenet of statutory construction, however, is to give effect to all parts of a statute when at all reasonable. As the Supreme Court noted in *FDA v. Brown & Williamson Tobacco Corp. et al.*, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme ... A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme ... and fit, if possible, all parts into a harmonious whole." *See also*

---

**3.** This provision does state that the agency's actions disqualifying an entity for reasons other than trafficking are subject to judicial review, but it is undisputed that disqualification for trafficking is also subject to judicial review in the same manner.

**4.** 7 U.S.C. § 2023(a)(13) (2000).

*Hohn v. United States,* 524 U.S. 236, 249, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998) (stating "[w]e are reluctant to adopt a construction making another statutory provision superfluous.").

■ To be sure, the Court generally defers to an agency's interpretation of ambiguous statutes that are specifically directed to the agency's functions. *See Chevron,* 467 U.S. at 844, 104 S.Ct. 2778. The statute at issue here, however, is not ambiguous so the reasonableness of the agency interpretation need not be addressed and no deference is warranted. Further, the statute at issue here is directed to the statutory grant of authority to the *Court.* By its construction in the CFR, the Agency attempts to remove or reduce that authority.

The Agency additionally points to the second sentence of § 2023(a)(18) which precludes an affected party from obtaining monetary relief against the USDA if it ultimately prevails on the merits of its challenge. This, the Government suggests, indicates that Congress intended to prevent injunctions from being issued and fully expected that damages could flow therefrom. This contention finds support in the only case on this point. As previously noted, in *Ilaian,* the District Judge found the Agency's regulation controlling on the issue and denied injunctive relief, implicitly finding the statute ambiguous. *See Ilaian,* 87 F.Supp.2d at 1048. The Court reasoned that "the immunity afforded the Secretary shows that disqualified parties may suffer substantial economic losses pending review of their cases, which would not be true if they could be given injunctive relief by the courts." *Id.* at 1048. The Undersigned respectfully disagrees with this reasoning.

Indeed, there are many circumstances in which the immunity from *damages* granted to the agency is important even though injunctive relief is *available* to a plaintiff.

First, and most obvious, just because a preliminary injunction is an available remedy does not mean it will be granted. Second, even prior to obtaining injunctive relief, the disqualified entity may sustain damages that are plainly not compensable in the face of this immunity. Third, the Government does not contest the right of those disqualified for reasons other than trafficking to obtain injunctive relief upon a proper showing. If they are unsuccessful on such a motion and prevail ultimately at trial, they too are barred from obtaining monetary relief against the Agency. Thus, all that the second sentence of § (a)(18) does is establish clearly the Agency's immunity from damages for improvidently imposed disqualifications. It speaks not at all about the availability of injunctive relief.

■ Perhaps the Government would suggest that the heading of § (a)(18) is some indication that the statute was meant to preclude the courts from enjoining disqualification pending review. The heading reads "Suspension of stores pending review." First, the heading is not inconsistent with the plain language of the statute. Absent obtaining the extraordinary relief of preliminary injunction, pursuant to § 2023(a)(17), a store's participation in the program is suspended pending agency review. Second, even if the heading were some indication that Congress intended to remove the Court's authority to grant injunctions, "the title of a statute and the heading of a section cannot limit the plain meaning of the text. For interpretive purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain." *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.,* 331 U.S. 519, 528, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947).

Finally, the denial of injunctive relief under the statute does not serve the laudatory purpose of the statute to police and prevent trafficking and to ensure that monies intended to benefit the poor go to that purpose. By its terms, the statute affords preliminary relief only to those entities or persons who can show by convincing evidence that they will likely be vindicated in regard to the disqualification. Congress has no interest, of course, in preventing persons who have not violated the act directly or through their employees from continuing to participate in the program. In any event, no such interest is expressed in the language of the statute or any reasonable interpretation of it.

For these reasons, the Undersigned REPORTS and RECOMMENDS that the Court find that there is no statutory prohibition against granting injunctive relief in this case. The Undersigned further RECOMMENDS that the Court find that 7 C.F.R. § 279.10(d) was improvidently promulgated and that the regulation should not be given deference. *See FDA v. Brown & Williamson Tobacco Corp. et al.*, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (finding that Congress had directly spoken on the issue disputed, the Court found the FDA did not have authority to promulgate the regulation and, therefore, gave it no deference); *see also U.S. v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292, 2001 WL 672258 (U.S.2001) (holding U.S. Customs Service's tariff classification ruling not entitled to *Chevron* deference).[5]

The Court must therefore turn to whether Plaintiff has met the statutory prerequisites for obtaining injunctive relief preliminary to final judgment.

## II. *WHETHER PLAINTIFF IS ENTITLED TO PRELIMINARY INJUNCTION*

Having considered the respective positions of the parties and having considered the evidence submitted in support of and in opposition to the motion, the Undersigned finds that the Plaintiff has met the prerequisites for entry of injunctive relief. Accordingly, the Undersigned REPORTS and RECOMMENDS that the motion for injunctive relief be GRANTED.

In order to obtain preliminary injunction relief he seeks, Plaintiff must satisfy the standards for entry of an order of injunction on the facts of this case. Section 2023(a)(17) affords Plaintiff a right to injunctive relief if he can demonstrate a

---

**5.** Because the Undersigned reports and recommends that the Court conclude that the statute does not bar all injunctions in favor of a retailer accused of trafficking, the Undersigned need not address the due process issue. Because this is a report and recommendation, the Undersigned would advise that the law is clear under *Holmes v. U.S.*, 868 F.Supp. 1348 (M.D.Ala.1994), *aff'd*, 67 F.3d 314 (11th Cir.1995), *cert. denied*, 517 U.S. 1188, 116 S.Ct. 1674, 134 L.Ed.2d 777 (1996) (hereinafter *"Holmes II"*) that the right to continued participation in the food stamp program is not a property right and therefore, no Due Process protections are implicated by disqualification from the program. The contrary authority of the same name, *Holmes v. U.S.*, 815 F.Supp. 429 (M.D.Ala.1993), cited by Plaintiff was reversed upon review by the *Holmes II* Court, in light of a decision by the Eleventh Circuit rendered during the pendency of the *Holmes* case. The *Holmes II* decision followed the directive of the Eleventh Circuit decision in *Bank of Jackson County v. Cherry*, 980 F.2d 1362 (11th Cir.1993), which held that citizens do not have a *right* to do business with the government and while economic injury is sufficient to confer standing, it does not create a property interest. *Holmes II*, 868 F.Supp. at 1353; *see also Board of Regents v. Roth*, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (holding that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.")

substantial threat of irreparable injury if injunction is not granted and a substantial likelihood of success on the merits of the case.

### A. *Substantial Threat of Irreparably Injury*

 Plaintiff contends that if the USDA is not enjoined from enforcing its decision to disqualify him from the Food Stamp Program, Plaintiff will suffer irreparable injury as a consequence. In support of his contention, Plaintiff/Owner, Juan Carlos Lazaro, testified by affidavit that in the 12–month period beginning April 2000, and ending March 31, 2001, Plaintiff's gross sales totaled $1,073,388.05 with $276,925.54 attributable to Food Stamp purchases. This 25.5% of gross sales in addition to an estimated 15% of gross sales attributable to purchases of non-eligible items by Food Stamp customers equals an estimated 40.5% of gross sales Plaintiff will lose if injunctive relief is not granted.

The Government argues, however, that monetary damages alone cannot be considered irreparable injury for the purposes of satisfying the test for injunctive relief. The Government further argues that even if economic losses were sufficient, Plaintiff substantially overstated the amount of his potential losses if disqualified from the Food Stamp Program. Specifically, the Government concedes that for the most recent 12–month period, beginning April 1, 2000 and ending March 31, 2001, Plaintiff did redeem $276,925.54 of food stamp benefits (*see* Dkt. 18, Exhibit B, Gentner Affidavit), but argues that this figure must be measured against $2,000,000 of food sales, a figure supplied by Plaintiff himself in his December 9, 1997, food stamp program application. As a result, the Government argues, less than 14% of Plaintiff's gross food sales actually derive from food stamp benefits—an amount which is 44% less than the 25.5% submitted by Plaintiff. It

further contends that if Plaintiff overestimated by 44% the amount of gross sales attributable to food stamp benefits, it should also be assumed that the 15% of gross sales Plaintiff claims is attributable to cash purchases by food stamp recipients is similarly inflated. Ultimately, the Government suggests that overall the estimated business loss expected if Plaintiff is permanently disqualified from the Food Stamp Program is only 22% of gross sales, and not enough to bankrupt Plaintiff or threaten the firm's existence and, therefore, not enough to constitute irreparable harm.

Upon review, the Undersigned accepts the calculations proffered by the Plaintiff. The calculation proposed by the Government is flawed in that it relies on a $2,000,000 gross food sales premise which was only an estimate. Question 23(A) of the Food Stamp Application Form (Dkt.18.Ex. A) calls for the applicant to mark whether it was reporting actual annual gross sales or estimated annual gross sales. Plaintiff checked off that the figure submitted was an estimate. When Plaintiff completed this application in December 9, 1997, he had only been in business since June 25, 1996. He would not have had an opportunity to accurately report earnings from a full year at that point. Further, since the Government used the actual amount of food stamp benefits redeemed by Plaintiff for the most recent 12–month period, beginning April 1, 2000 and ending March 31, 2001, it is proper and consistent to measure that figure against Plaintiff's actual gross food sales for the same period. The Undersigned, therefore, finds that Plaintiff has established on this evidence that he would lose 40.5% of his business if subjected to permanent disqualification from the Food Stamp Program.

As to whether this loss establishes irreparable injury, the Government is correct in its contention that monetary damages alone do not sufficiently form a basis for irreparable injury. Under these circumstances, however, to the extent that a loss of 40.5% in gross sales could result in Plaintiff's forced closure of the business and deprivation of his livelihood, Plaintiff has established that he will be irreparably injured absent injunctive relief. *See Ibrahim v. U.S.*, 650 F.Supp. 163, 165 (N.D.N.Y.1987) (finding irreparable injury where thirty percent loss of income due to disqualification would likely result in the forced closure of the business.).

### B. *Substantial Likelihood of Success of the Merits*

Plaintiff also argues that he can demonstrate a substantial likelihood of success on the merits of his action for *de novo* review. First, Plaintiff contends that he can demonstrate that the transactions as alleged by the Government did not occur as alleged by the Government. In addition, Plaintiff contends that the agency's decision to deny his request for a civil monetary penalty was arbitrary and capricious.

#### 1. *Factual Dispute Surrounding Alleged Violations*

Plaintiff will bear the burden of proving at trial that the disqualification was not valid. *See Odeh v. United States*, 1996 WL 378931 (M.D.Fla.1996) (*citing Holmes v. United States*, 868 F.Supp. 1348, 1351 (M.D.Ala.1994)). Plaintiff contends that he can establish a likelihood of success on the merits by proving that the underlying, allegedly violative transactions did not occur as the Government alleged.

Specifically, the Government states in its letter of charges that on August 3, 1999, a male employee of Plaintiff accepted $16.91 in Electronic Benefits Transfer (EBT) proceeds from a confidential informant in exchange for $10 in cash, in violation of 7 C.F.R. § 278.2(a). The USDA also charged that again on August 6, 1999, a female employee of Plaintiff accepted $42.00 in EBT benefits in exchange for $22.00 in cash. The "evidence" of these transaction consists of a certified Report of Positive Investigation signed by a USDA–FNS compliance investigator, Edward Agostini. *See* Dkt. 11, Ex. I. In this report, the investigator states that the data used in the report is taken from a signed statement from the confidential informant. The informant's signed statement is not proffered, but the second-hand accounting of the transaction by the investigator is proffered by affidavit.

As an initial matter, the admissibility of this "evidence" is of concern even under the lax standards applicable in hearing motions for injunctive relief. The investigator's report, essentially, is the investigator's account of what the informant told him occurred inside the store and what was allegedly said by the clerk to the informant. The affiant has no personal knowledge of any of these facts. As such, those portions of the report recounting the informant's statements consist of two levels of out-of-court statements offered for the truth of the matter asserted and are, therefore, hearsay. *See* Fed.R.Evid. 801(c).

While the investigator's statements by affidavit are in a form generally admissible on a motion for injunction relief, the statements allegedly made by the informant to the investigator are not. To this point the confidential informant's identity has not been revealed. Despite the Court's inquiry at the hearing, no affidavit of the informant was submitted during the period in which the hearing remained open to allow additional submissions by the Government. The reporter did not offer any attestation regarding the Agency's prior dealings with

the informant or the informant's credibility.

Both levels of hearsay must come under an exception or, otherwise, have an independent basis of admissibility to be considered by the Court. *U.S. v. Pendas–Martinez*, 845 F.2d 938, 942 (11th Cir.1988). There is an exception to strict compliance with evidentiary standards on injunction motions that is recognized, but even then, the proffered evidence must be imbued with inherent reliability. Statements of an unidentified confidential informant whose reliability is not attested to by the proffering agent do not fall within this exception, especially where, as here, the case rises or falls on the strength of these statements. As such, the Court has little in the way of "evidence" to support the agency's allegations as to the August 3 transaction.

■ Even if the report in its present form were admissible, Plaintiff points out additional factual deficiencies that undermine the disqualification finding made here. First, the investigator reports, in the August 3 Summary of Transactions (Dkt. 11, Ex. I, Section B), that on August 3, 1999, he accompanied the confidential informant to the Plaintiff's store, where he had the informant turn over to him all cash and EBT cards that were in the informant's possession. The investigator then gave the informant an EBT card with a total value of $418.13, and the informant took that card inside Plaintiff's store. The summary further reports that the informant selected three food items—a 20–ounce loaf of bread, a 12–ounce pack ham and a 5–pound box of sausage—and proceeded to the single cashier/clerk on duty. At the checkout, the clerk allegedly sold the three items to the informant at a total cost of $29.18. Here the summary states that the informant reported to the agent that he/she (the informant) asked the clerk to give him/her some cash from the EBT card, whereupon, the clerk gave the infor-

mant $10 cash back in exchange for $16.91. The Government's evidence, the EBT transaction receipt, establishes that the informant was charged $29.18 and the EBT card was returned with a $388.95 balance. The Government does not, however, provide an itemized transaction receipt for this transaction, which would show what items were actually purchased, as it does for the August 6 transaction.

From the information set forth in the report, the total purchase price for the three items the informant claims he/she purchased totals $12.27, allegedly leaving $16.91 unaccounted. Under the Government's construction of the events, the clerk gave the informant $10.00 of the $16.91, and the store presumably retained $6.91.

Plaintiff further testified and proffered by affidavit that there were no overages in the register for that day. He also testified that the only persons with access to the register that day were his brother, two cousins and an employee, Stephanie Gato, and himself, all of whom had been warned about customers asking them to exchange cash for food stamp benefits and were also trained that it is illegal to comply.

The absence of an itemized transaction receipt of this August 3 transaction weakens the Government's defense that evidence should have been made available to the informant at the time of the purchase, along with the EBT receipt, and if it was, certainly the investigator should have requested it from the informant. Again, as noted, it is particularly problematic in this context because all that remains as evidence of the items purchased and charged are the unsworn statements allegedly made by the informant to the agent. There is no indication of how the informant derived the purchase price information—from memory or some documented source.

The second transaction of August 6, 1999, suffers from the same evidentiary deficiencies as the August 2, 1999, noted above. In addition, the August 6 transaction suffers from some factual deficiencies. First, the investigator's August 6 Summary of Transaction (Dkt. 11, Ex. I, Section B), again allegedly informed in part by the informant's unsworn statements, reports that after taking possession of all of informant's cash and EBT cards, the agent gave the informant an EBT card having a total value of $80.63 and the informant made purchases totaling $80.63. *See* (Dkt. 11, Ex. I, August 6 Transaction Report, Section B). According to the Summary of Purchase, however, the EBT card had a value of $702.33 when issued, $80.63 was charged, and the card returned with a $621.70 balance. Even assuming that the inconsistency relating to the initial value of the EBT card is a clerical error, there are other inconsistencies which are more problematic.

First, the report indicates that the informant reported that he/she approached the cashier/clerk with two items, an 8–pound package of fish and a 7–pound package of pork chops. He/She purportedly told the cashier/clerk that another clerk was going to give the informant some cash from the card. The female cashier/clerk allegedly opened the drawer to see if she could give the informant some cash and told him/her she would give $22.00. Importantly, the report indicates that the clerk gave the informant "a cash register tape with total she charged but with various items on it. Total cost of the food was $38.63. Clerk gave the CI $22.00 cash for $42.00 of food stamps."

Plaintiff points out that the investigator's report of the August 6 transaction indicates that only two items were brought to the register, totaling $38.63, but the register receipt indicates that seventeen items were purchased, totaling $80.63, the exact amount charged to the EBT card. Plaintiff further points out that the register receipt actually indicated that three meat items were purchased and that those three meat items only totaled $26.94, not $38.63 as indicated by the investigator's report. Plaintiff argues further that the only way for the transaction to have happened as the reports indicates would have been for the clerk to have fabricated the register receipt while the transaction was taking place, and to have simultaneously kept a running mental count of the fabricated amounts charged.

The investigator's report, however, does not allege that fifteen extra items were charged nor does the informant indicate that he witnessed a fabrication. The Government does not respond to the Plaintiff's challenge of the August 6 transaction.

As such, the Plaintiff's contentions are well-taken by the Undersigned. The sales receipt that the Government proffered indeed indicates seventeen items entered, with three meat items indicated, for a total charge of $80.63, the amount charged to the EBT card. Standing alone, this receipt does not support the Government's version of events and tends to prove Plaintiff's version.

This evidence is to be distinguished from that proffered in *Odeh*. There, Plaintiff primarily offered conclusory denials of deficiencies. The Plaintiff did not offer specific attacks on the evidence nor did she attempt to demonstrate that the Government's evidence tended to prove that legitimate food purchases occurred. *See Odeh v. United States*, 1996 WL 378931 (M.D.Fla.1996).

In sum, this August 6, 1999, transaction allegation is strife with factual inconsistencies. The August 3, 1999, allegation suffers from a critical lack of evidence. Further, the Government's sole proffer of evidence as to both transactions consists

largely of impermissible multi-level hearsay. As such, Plaintiff has demonstrated, on this basis, a substantial likelihood of success on the merits. .

### 2. *Civil Monetary Penalty*

 Plaintiff also contends that he is likely to prevail on the merits based on the Government's arbitrary and improper denial of its request for a civil monetary penalty. 7 U.S.C. § 2021(b)(3)(B) provides in relevant part that:

[T]he Secretary shall have the discretion to impose a civil monetary penalty of up to $20,000 for each violation ... in lieu of disqualification ... if the Secretary determines that there is substantial evidence that such store or food concern had an effective policy and program in effect to prevent violations of the chapter and the regulations, including evidence that (i) the ownership of the store or food concern was not aware of, did not benefit from, and was not involved in the conduct of the violation ...

Plaintiff argues that though he did not provide to the administrative review officer documentation of a policy or program as required under 7 C.F.R. § 278.6(i), he should have been granted the CMP on the basis of his affidavit which states that he had a program and policy in place and that he did not benefit from the transactions.

The Secretary's decision to grant or deny this alternative penalty is to be reviewed for abuse of discretion. The agency's regulation states that it shall consider written and dated statements of the firm's compliance policy, documentation that such policy statements were provided to violating employees prior to the commission of the violation, and the firm's dated training curricula and records of dates training sessions were conducted. *See* 7 C.F.R. § 278.6(i)(1) and (2).

While the agency certainly could have chosen to accept the Plaintiff's affidavits alone as proof, it is not required to do so in light of these provisions. As such, the Undersigned cannot find that Plaintiff is likely to prevail in his assertion that the Secretary abused his discretion in denying Plaintiff's request for a civil monetary penalty in lieu of disqualification.

Having so found, there remains for the Court's consideration the matter of personal jurisdiction and adequacy of notice as raised by the Agency.

### C. *Jurisdiction and Notice*

 The Agency argues that this Court lacks jurisdiction over the named Defendant, previously the USDA, currently, the United States. Specifically, Defendant contends that pursuant to Fed. R.Civ.P. 4(i)(2), in order to serve properly the United States Department of Agriculture, Plaintiff must serve, by delivering or mailing by certified or registered mail, a copy of the summons and the complaint to (1) the United States Attorney for the Middle District of Florida via the designated employee or the civil process clerk of the U.S. Attorney; (2) the Attorney General of the United States at Washington D.C.; and, (3) the USDA via the person in charge of the applicable regional office.

 Plaintiff has the burden of demonstrating that service of process was proper. *See Binder v. Sekulow,* 106 B.R. 313, 315 (N.D.Ga.1989) ("Once service of process is challenged, the burden of proof is on the plaintiff to establish its validity.") (citations omitted); *Robins v. Max Mara, USA, Inc.,* 923 F.Supp. 460, 469 (S.D.N.Y. 1996). "Moreover, it is well recognized that a 'defendant's actual notice of the litigation ... is insufficient to satisfy Rule 4's requirements.'" *Mid–Continent Wood Products v. Harris,* 936 F.2d 297, 301 (7th Cir.1991) (quoting *Way v. Mueller Brass Co.,* 840 F.2d 303, 306 (5th Cir.1988)).

**1218**

In this case Plaintiff served his original Complaint by sending copies of the Complaint and the summons by certified mail to Donna Bucella, then United States Attorney for the Middle District of Florida and Attorney General John Ashcroft in Washington, D.C. Plaintiff certified that he contacted Ann F. Wages, Officer–in–Charge of the United States Department of Agriculture Food and Nutrition Service in Tallahassee, Florida and advised that he was filing the Complaint. Plaintiff's counsel advised that he subsequently served Anne Wages with a copy of the Complaint and summons prior to the preliminary injunction hearing. The Agency contends Plaintiff should have served the Regional Administrator of the Southwest Region of the United States Department of Agriculture Food and Nutrition Service in Atlanta, Georgia, citing 7 C.F.R. § 279.10(b), which states that the summons and complaint should be sent to the person in charge of the applicable regional office of FNS.

Fed.R.Civ.P. 4(i)(2) states that service upon "an officer, agency, or corporation of the United States" shall be effected by serving a copy of the complaint and summons on the "officer" or agency. In this case, Plaintiff mailed the original complaint by certified mail to the Officer–in–Charge of the United States Department of Agriculture, Food and Nutrition Service, Tallahassee Field Office. Plaintiff contends that he properly served the Complaint by addressing it to the office where the decision to uphold the disqualification was made.

Neither party has identified, nor could the Court locate, any statute or regulation explicitly addressing who is authorized to accept service of process for the agency for judicial review of an adverse USDA decision. In the absence of any controlling regulation, the plain language of Fed. R.Civ.P. 4(i) indicates that service upon

Ann Wages of the Food and Nutrition Service was sufficient, since she was the FNS *officer* who made the final agency decision to deny Plaintiff the relief he sought. *See* Dkt. 14, Ex. B, Letter dated March 14, 2000. In any event, it is apparent that service upon Wages has served the purpose of putting the agency and its attorney on notice of this suit. The United States Department of Agriculture Senior Attorney Mark L. Stevens joined in the United State Attorney's opposition to the Plaintiff's motion for preliminary injunction. *See* Dkt. 18, page 9.

The Undersigned thus finds that service of the Complaint upon Wages is sufficient and personal jurisdiction over the Defendant exists.

 The United States also objects to the timing of the preliminary injunction hearing, contending that Plaintiff's motion for preliminary injunction, which was served on the United States Attorney on April 13, 2001, was set for hearing on April 25, 2001, on only eight days notice, not the statutorily mandated ten days notice. The Defendant contends that under Fed. R.Civ.P. 6(a), weekends and holidays should not have been included in computing the time for the hearing, pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.

At the preliminary injunction hearing, at which the Assistant United States Attorney made a limited appearance, Government's counsel conceded that actual notice was given, but argued that they did not have enough time to adequately prepare a complete response. In its order dated April 30, 2001, therefore, this Court gave the Government additional time to file a complete opposition memorandum and to file whatever additional materials and evidence it had in support. The Government took advantage of the opportunity and submitted an additional affidavit on the issue

of irreparable harm. In addition, the Court granted the Government's request for a five day extension of time to submit its complete memorandum and additional evidence. *See* Dkt. 22. As such, the Government had ample opportunity to submit all its arguments and supporting documents.

Based on the foregoing, the Undersigned finds that Plaintiff has established that he will be irreparably injured if injunctive relief is not granted and that he has a substantial likelihood of succeeding on the merits. Accordingly, the Undersigned REPORTS and RECOMMENDS that Plaintiff's motion for preliminary injunction be GRANTED.

Dated: July 2, 2001.